### 24716. BIBB MANUFACTURING COMPANY *v.* SOUTHER.

DECIDED JANUARY 31, 1936. REHEARING DENIED FEBRUARY 28, 1936.

*Jones, Johnston, Russell & Sparks,* for plaintiff in error.

*Feagin & Feagin,* contra.

MacIntyre, J. Souther sued Bibb Manufacturing Company, to recover damages for personal injuries alleged to have been sustained because of the negligence of a negro who was in the general employment of Bibb Manufacturing Company. The sole question for determination is whether or not the judge erred in overruling a general demurrer to the petition as amended. The parts of the petition deemed necessary to be considered in passing on the question at issue are as follows:

Paragraph 3, as amended, substantially avers that "W. E. Bartlett, trading as the Bartlett Sheet Metal Works, . . contracted with the defendant . . to take down and repair four blowpipes located in the . . Ospray Mills . . , said mill being owned and operated by the defendant herein;" that "on or about and for some time previous to March 3, 1934, your petitioner was in the employ of W. E. Bartlett, trading as the Bartlett Sheet Metal Works;" that "the pipes had to be repaired separately, and that on March 2, petitioner and one assistant in Bartlett's employ had finished the work on two of said pipes and were ready to start on the third pipe;" that "in taking down the two said pipes" petitioner "was assisted by employees of the defendant operating a derrick belonging to defendant, and under the supervision of Mr. Homer James, foreman carpenter in charge of the construction of a new building over which the said pipes ran, and in the regular employ of the defendant;" and that "said agent of the defendant personally supervised the use of the said derrick in taking down the said pipes." Paragraph 4, as amended, avers that on March 2, 1934, petitioner (Souther) "was sent out by said Bartlett, with one helper, to repair the third of said four blowpipes." Paragraph 5 is as follows: "On March 3, 1934, petitioner had the pipe down and was ready to repair the same, but that to properly repair and rivet the said pipe it became necessary for petitioner to have a piece of railroad iron or something similar on which to string the joints of said pipe. Accordingly, your petitioner went out in the yards of defendant's mill and found a piece of railroad track iron, but petitioner shows that the only piece to be found was too long

for 'the purpose for which it was intended, the piece being 35 feet long, and was too long to be handled alone by your petitioner and his assistant, so petitioner obtained a hacksaw and requested help from Mr. Homer James, foreman carpenter at said mill, and agent of defendant. Said agent of defendant furnished petitioner with two negro helpers whose names petitioner does not know, but who are both in the employ of defendant in said mills, and were agents of defendant."

By amendment, the following paragraph, numbered 5B, was added: "Petitioner shows that the two said negroes were in the regular employ of the defendant in said mills, and that they were being paid for their services by said defendant, and that they were not to be paid anything by either petitioner or his employer, Bartlett Sheet Metal Works, or by said W. E. Bartlett. Petitioner shows that he was given no authority to discharge either or both of said two negroes, and no authority over their actions other than to tell them what was required of them at that particular instant and in that particular transaction. Petitioner shows that the two said negroes remained in the general employ of said defendant, but were loaned to Bartlett Sheet Metal Works with direction by an agent of said defendant to assist said Bartlett Sheet Metal Works and petitioner as a part of their duties as employees of said defendant, to act under the direction and supervision of petitioner and said Bartlett Sheet Metal Works only in so far as said specific work was concerned." Paragraph 6: "Petitioner shows that he with his assistant and the two helpers furnished by defendant placed the said piece of railroad iron across a spur-track in the yards of said mill, and that he instructed the two helpers furnished by defendant to hold the said piece of iron in place while he sawed it in two. The said piece of iron was a large, heavy piece of iron, and your petitioner was sawing it with the wide edge on top and upright, the wide edge being the edge or surface on which the wheels of the cars would run were the iron in use as track. Petitioner sent his assistant to find a sledge-hammer to use to break the track when it was sawed thin enough to be broken with a blow." Paragraph 7: "Petitioner shows that just before his assistant returned with the sledgehammer, and while he was still sawing on the piece of iron, which was being held in place by the two said servants of the defendant, one of said helpers furnished by

said defendant released his hold upon the said piece of iron and allowed the same to topple over on its side and fall on the left hand of petitioner, with which hand your petitioner had been holding on to the rail of the said spur-track for support, and crush the hand of petitioner," etc. Paragraph 8 avers that "said helper of defendant who released the iron" was negligent in so doing; that "said negligence was the approximate cause of petitioner's injuries;" and that "said negligence is imputable and chargeable to the defendant, . . and is the negligence of defendant, because said helper was in the employ of defendant, and was in the due course of his employment at the time of said negligence and petitioner's injuries." Paragraph 10 avers that "prior to said happening he [petitioner] was a sheet-metal worker and regularly employed with said Bartlett Sheet Metal Works." Paragraph 13 avers that petitioner "was in the exercise of ordinary care and diligence in all the matters complained of, and could not have avoided the consequences of defendant's negligence by the exercise of ordinary care and diligence."

"The master's responsibility can not be extended beyond the limits of the master's work. If the servant is doing his own work or that of some other, the master is not answerable for his negligence in the performance of it." Standard Oil Co. v. Anderson, 212 U. S. 215, 221 (29 Sup. Ct. 252, 53 L. ed. 480). "It is well settled that 'the fact that an employee is the general servant of one employer does not, as matter of law, prevent him from becoming the particular servant of another, who may become liable for his acts. And it is true as a general proposition that when one person lends his servant to another for a particular employment (or hires him), the servant, for anything done in that particular employment, must be dealt with as the servant of the man to whom he is lent (or hired), although he remains the general servant of the person who lent him (or hired him).'" 18 R. C. L. 784. "The real test by which to determine whether a person was acting as the servant of another at the time of the infliction of an injury by him is to ascertain whether at the particular time when the injury was inflicted he was subject to the other person's orders and control, and was liable to be discharged from the particular employment for disobedience of orders or misconduct. Brown v. Smith & Kelly Co., 86 Ga. 277 (12 S. E. 411, 22 Am. St. R. 456).

'One person may be taken to have been the servant of another in respect of a given transaction, although he did not occupy that position for all purposes. In order to establish the relationship, it is merely necessary to show that he was a servant as regards the particular piece of work in which he was engaged at the time when he sustained or inflicted the injury complained of. . . The special master is alone liable to third persons for injuries caused by such wrongful acts as the special servant may commit in the course of his employment.' LaBatt on Master & Servant (2d ed.), § 52." *Reaves* v. *Columbus Electric & Power Co.,* 32 *Ga. App.* 140, 148 (122 S. E. 824). The following quotations are from the cited sections of LaBatt's Master & Servant (2d ed.) : "§ 18. *Exercise of control over the details of the work.* The doctrine that a servant is a person who is subject to the control of his employer with respect to the manner in which the details of the work are to be performed (§ 2, *ante*) involves the corollary that the exercise or non-exercise of control of this character by the person alleged to be a master is the element which must, in the last analysis, always determine what was the essential nature of the relationship between the person who performed the given work, and the person for whom it was performed. . . All the other elements which are discussed hereafter, even those which are normal and customary incidents of contracts of service, are, in an evidential point of view, material only in so far as they may tend more or less strongly, under the given circumstances, to show that the alleged master exercised control over the alleged servant."

The author then takes up the "elements" referred to : § 19 : "It will be found that the payment of wages by one person or by another has usually been viewed either as a merely corroborative circumstance or as a circumstance to be disregarded, supposing the remainder of the testimony to point to a conclusion different from that indicated by it." It is said in § 20 that "the fact that an employee was appointed by one of two persons having an interest in the work to be performed does not show him to have been the servant of that person, if it is established that he was to be under the control of the other person while the work was in progress." § 21 : "*Power of dismissal.* The fact of a certain person's having possessed the power to discharge the employee in question has a strong tendency to show that the relation of master and servant

existed between them. But the conclusion which proof of this fact would otherwise warrant can not be drawn if it is apparent from the remainder of the evidence that, in respect to the details of his work, the employee was under the control of some person other than the one in whom the power of discharge was vested. On the other hand, although it is perhaps possible to form a theoretic conception of cases in which the relation of master and servant would be predicable between two persons, in spite of the fact that the power of dismissal was not vested in the master, it is apparent that the situation thus supposed is entirely incompatible with the due exercise of that authority and control which is the very essence of the relation, that such cases are very unlikely to occur in practice. Ordinarily, therefore, the non-existence of the relation of master and servant will be inferred whenever it appears that the alleged master had no power to dismiss the alleged servant." § 22, in part: *"For whose benefit the given work was done.* . . This criterion has sometimes been applied in cases where the issue to be determined was whether the person performing the work was or was not a servant. But the effect of such evidence has been much more frequently illustrated in cases where it is conceded that the person doing the work was a servant, and the point to be settled was which of two other persons was his master. But it is well settled that the conclusion which is indicated by this fact is always subject to rebuttal by evidence which shows that the power of control was exercised by a person other than the one who received the benefit of the work." § 23 in part: *"Evidential significance of two or more of the foregoing elements in combination.* The cases involving two or more of the elements discussed in the preceding sections may be divided into two classes: (1) Those in which one of the elements referred to is the fact that the person declared to be the master had the right to control the person declared to be his servant. In such cases it is clear that, as evidence etablishing the possession of this right by the former is sufficient of itself to prove that he was the master of the latter, any other element that may be mentioned in sustaining the conclusion arrived at is to be regarded as carrying a merely corroborative value,—as where it is stated that the former of those persons employed, controlled, and paid, and had the right to discharge the latter; . . or where the existence of the relation has been de-

nied on the ground that the alleged master neither controlled nor paid, nor had a right to discharge, the alleged servant. (2) Those in which the exercise of the power of control is not specially adverted to. In these cases the elements mentioned are to be regarded simply as being indicative of conditions which imply that the person declared to be the master did, as a matter of fact, exercise control over the person declared to be the servant. . . A servant may be loaned or hired by his master for some special purpose so as to become, as to that service, the servant of the party to whom he is loaned or hired, and to impose on the latter the usual liability of a master. The test of liability for the acts of the servant is whether in the particular service which the servant is engaged or requested to perform he continues liable to the direction and control of his original master or becomes subject to that of the person to whom he is lent or hired, or requests his services. It is not so much the actual exercise of control which is regarded .as the right to exercise such control. To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under the control of a third person." 39 C. J. 1274, § 1462. The foregoing statement in Corpus Juris is sustained by the Supreme Court of the United States in Standard Oil Co. *v.* Anderson, supra. In Georgia "the real test" is found in the statement quoted from *Reaves* v. *Columbus El. Co.,* supra. See also *U. S. F. & G. Co.* v. *Stapleton, 37 Ga. App.* 707, 710 (141 S. E. 506), and cit.; *Spaulding Oil-Mill Inc.* v. *Mayes, 48 Ga. App.* 613, 616 (172 S. E. 734).

It appears from the petition in the case at bar that Bartlett was an independent contractor employed by the defendant to do a particular job, and that job was "to take down and repair four blowpipes." These pipes had to be repaired separately, and, since the work on two of them had been finished before the time the two negroes were loaned Bartlett by the defendant, the allegation of paragraph 3 of the petition that "petitioner . . in taking down the two said pipes . . was assisted by employees of the defendant operating a derrick belonging to defendant," etc., appears immaterial in passing on the general demurrer. The allegations in paragraph 5B, to the effect that the two negroes were regularly in the employment of the defendant and were being paid by it alone, and that they remained in the general employment of

the defendant, are entirely compatible with the negroes' being the special servants of Bartlett, but are of little or no value in determining whether they were or not. The plaintiff had the third blowpipe down and was "ready to repair the same. . . To properly repair and rivet the said pipe it became necessary . . to have a piece of railroad iron . . on which to string the joints of said pipe." The plaintiff found a railroad iron, but it was too long for the purpose intended, and it was necessary for the petitioner to have additional help. This help (the two negroes) was loaned to Bartlett by the defendant. Whether the negroes were loaned to Bartlett to do any work incident to repairing the third blowpipe, or whether they were loaned to him to do work which was only incident to preparing the railroad iron for the necessary purpose intended, they were bound to assist in doing work connected with Bartlett's contract to repair the four blowpipes, and it is averred in paragraph 5B of the petition that the negroes were "to act under the direction and supervision of petitioner and said Bartlett Sheet Metal Works only so far as said specific work was concerned." It is urged that the word "only" in the phrase last quoted denied Bartlett the right to put the negroes about other work, and refutes the contention of the plaintiff in error that the negroes were the special servants of Bartlett. Our view is that the phrase "put him [the servant] about other work" means work connected with the particular work he was loaned or hired to do,—not that the person to whom the servant is loaned or hired *must* have the right to make the servant work on a job entirely different from that for which he was lent or hired. If this were not true, the term "special employment" would be stripped of its true meaning. Our view is that the negroes were loaned for a special job, and that Bartlett had the right to put them at any task in their line which was properly connected with that job. In short, we think he did have authority to put the negroes "about other work." We do not think the averment in paragraph 5B, that the negroes were loaned Bartlett to assist him "as a part of their duties as employees of said defendant," can, when construed with the remainder of the sentence in which the quotation occurs and the other allegations of the petition, be deemed a denial that the negroes were the special servants of Bartlett. Whatever that phrase may mean, the negroes were loaned

to act under the direction and supervision of the plaintiff and Bartlett Sheet Metal Works only in so far as said specific work was concerned.

But it is insisted that Bartlett had no authority to discharge the negroes, and that such authority was indispensable to constitute them his special servants. The "real test," as stated in the *Reaves* case, supra, concludes as follows: "and was liable to be discharged from *the particular employment* for disobedience of orders or misconduct." Our view is that the averment in paragraph 5B, that the "petitioner . . was given no authority to discharge either or both of said two negroes," is not tantamount to an allegation that Bartlett was without authority to discharge them from the particular job for which they were loaned; and that even if it were, it would contradict Bartlett's stated right to direct and supervise the negroes "only in so far as said specific work was concerned." Bartlett had the right to use such helpers as he deemed proper in performing the job he contracted to do, and the two negroes were merely loaned to help him do that job. Surely, if those negroes, or either of them, disobeyed Bartlett's orders, or were guilty of misconduct while working for him, he could rid himself of their services; that is to say, he could discharge them. "It is true as a general proposition that when one person lends his servant to another for a particular employment . . , the servant, for anything done in that particular employment, must be dealt with as the servant of the man to whom he is lent . . , although he remains the general servant of the person who lent him." *Reaves* v. *Columbus Electric & Power Co.*, supra. Our view is that though the negro whose negligence is alleged to have caused the plaintiff's injuries was in the general employment of the defendant, for the time being, with respect to the work negligently performed, he was the servant of Bartlett; and we hold that the judge erred in overruling the demurrer based on the ground that "said petition sets forth no cause of action against this defendant." In addition to the authorities cited, see *Greenberg & Bond Co.* v. *Yarbrough, 26 Ga. App.* 544 (106 S. E. 624), and Powell v. Virginia Construction Co., 88 Tenn. 692 (13 S. W. 691). In the cases mainly relied on by the defendant in error we find nothing that conflicts with the conclusion reached above. Those cases are *Brown* v. *Smith & Kelly Co.*, supra; *Postell* v. *Bruns-*

*wick & Western R. Co.,* 112 *Ga.* 602 (37 S. E. 869), and *Georgia Railway & Power Co.* v. *Middlebrooks,* 34 *Ga. App.* 156 (128 S. E. 777).

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*