33018.   ROZENBERG *v.* SUND.

DECIDED MAY 19, 1950.   REHEARING DENIED JULY 7, 1950.

*Smith & Stephens,* for plaintiff in error.

*Sam S. Harben,* contra.

FELTON, J.   H. F. Fuller testified for the defendant.   His relevant testimony was as follows:  "I work at the Gainesville Hide & Metal Company.   I have been with them since 1942, have worked continuously there since that time.   I'm manager down there.   I have bought some things from James Roberts, quite a few times.    I don't know the exact date I started buying things from him, because at that time we were buying quite a bit of stuff and it had been going on for six or eight months, I think, before this particular time in question.   We bought general scrap from him; automobile parts or backs ends, farm machinery at time, or just a general line of scrap iron.   He first started bringing the scrap with a little mule and a sled, when he first began to come.   Then he got him a little wagon and a mule, and then finally bought him a truck.   I understand his father bought him a truck.   He hauled things to our place in the truck quite a few times.   I would say we purchased metals and scrap from him for a period of six or eight months. . . I never had the slightest doubt about the boy at all.   He had an open face and he seemed to be very reliable, and he had been there at different times.   His father had been there with him really.   I think it was about June, 1948, when he came to me and said he had bought a tractor, was trying to buy a tractor at first.   He was trying to buy a tractor from somebody.   I don't believe he told me who, and it was too heavy for him to handle.   And I told him to go ahead and see if he could make the deal and if he could, come back and talk to me about it, I'd be interested in buying it.   So I think that was all that was said at that time.   Maybe three or four days . . he came back and told me he had bought this tractor and said he couldn't handle it, and asked me if I would help him handle it.   I told him no, I couldn't—didn't have the time then to fool with it, but I would rent him my cutter and let him do the hauling himself. I'd just rent him my cutter at so much an hour and let him do

the hauling himself, that I didn't have time to fool with it. I told him I'd pay him $1.25 a hundred for the scrap and charge him $3 an hour for a cutter, and I agreed to pay him $1 a hundred for the iron as it came in, and at the end of the period, when it was cleaned up, we'd have a settlement and then I figured the 25 cents on the hundred would take care of our cutter and we'd have a final settlement at that time when he completed the job. The $1 per hundred was to be paid him at the time of delivery, but the actual price we were to pay him was $1.25. At the final settlement he was to pay me $3 an hour for the cutter. That was agreed on, was satisfactory to him, and we went to work the next day under that agreement. I did not know where he had purchased the machinery, I didn't go out and look at those things because we had quite a few heavy jobs coming in at that time, and I'd just get the location and send the men on with the work. I did not know whose machinery it was until after I had received the materials I have at this time. Not until the day after he brought that first load in there, I believe the morning after, Mr. E. Eston Eads came to the shop that morning and asked me if I had bought that equipment and I told him I had, and he said he thought there was some doubt as to the ownership of it and asked me to put it to one side and wait till they had it settled, so I had it put to one side and it's still there. Still there on one side of the lot. . . I stopped my cutter immediately upon learning that the tractor was not James Roberts.' Mr. Eads was the first notice I had of anything being wrong. I did not tell Mr. Art Sund that when I saw the condition of the pieces of metal brought in there, that I thought something was wrong. I never did see them until after Mr. Eads came down. He and I went and looked at it after that, that's the first time when I saw the stuff. I stopped the cutting before that, the evening before, about three or four o'clock, I believe, they quit. They ran out of oxygen or something and came in about three-thirty, four o'clock in the afternoon the day before this, then Mr. Eads came down the next morning and that's the first time that I went out and looked at the tractor parts that had come on. I just weighed them. The scales is on the outside and I weigh on the inside and don't have any chance to see it unless I walk out and inspect it. And where

our own cutter is doing the cutting, I know there's no use to look at it and I never examine it, just weigh it and go ahead. Nothing was ever done under my direction after Eston Eads mentioned it to me. They never did go back out there at all. Up until that time I had no inkling of anything being wrong. I told Mr. Harben when he came down there, I said, 'There's your stuff. You can have it if you want it.' I offered to restore it to them. Mr. Sund was present. . . Ed O'Kelly runs the cutter. He is the man who operated the acetylene torch and cut it. He worked for Mr. K. Rozenberg. . . We did pay him for cutting this up, and we simply deducted 25 cents on each 100 that we were going to charge the Roberts boy for his time. . . I sent the truck with the cutting equipment that carried the crane with the cutting equipment, and then later I sent a truck with some acetylene down. The crane is used to pick up the stuff cut off. It was our crane. I never had given this boy's age a thought. I never questioned him about his age. I didn't ask him from whom he got this tractor and I never did ask him to exhibit to me any evidence of ownership, or a bill of sale or anything. I just accepted his word that he had bought a tractor. I didn't go to look at it myself. It wasn't customary with us to see if it belonged to this boy or not. When we had an offer to buy junk, we usually bought it by the hundred-weight and we wouldn't have time to go out and look at all those little things. I'd been in the habit of seeing him around with his father and knew he was hauling around and not only for me but other people, I'd consider him in business for himself. . . After he said he had bought the equipment I think that was the end of it. . . I imagine Mr. O'Kelly should know something about a tractor when he looks at it, should know whether it is junk or good or not. I imagine he could tell pretty well, with fourteen years experience behind him he should be able to tell. He is a grown man and a man of normal intelligence. He might have given it a thought but it wasn't brought to my attention. If Mr. O'Kelley, when he got there, asked this boy if that wasn't Art Sund's tractor, that was enough to excite his suspicion. I did not get the statement though, I heard Art make it on the stand, but I never did remember his making that particular statement. We were all talking and if he made that statement

it slipped by me. I don't know if I would have known if it was junk if I had looked at it, but I did not go out and look at it. . . All of this was hauled to my place on Mr. Roberts' truck and none of it on our trucks. Mr. Roberts or his boy wouldn't operate the cutting torch, Mr. O'Kelly wouldn't permit that. I had not heard anything about the Roberts boy before this having been in trouble about stealing knives from a hardware store." James Roberts testified as follows: "My name is James Roberts, and I am seventeen years of age. . . I sold Mr. Fuller metal and other scrap about six or seven months. . . I have been in court all through this session and heard the testimony concerning this tractor that Mr. Sund refers to. I sold some scrap from that to Mr. Fuller, but I talked to him about it first before I actually traded with him. I mentioned it to him about three or four days before I actually sold it to him. I told him that I had found one that I was planning on getting if I could and asked him if he would take it. This tractor was down near the golf course, near the rock quarry. I later bought this tractor. I found out whose tractor it was by asking the man who lived up on the hill, across the road in front of it. He said it was Art Sund's but it sounded like he said Sundred. I attempted to find Mr. Sund and did find someone I understood was Mr. Sund. It was not the gentleman here (indicating Mr. Art Sund), I bought the tractor and paid fifty dollars for it. I was to pay for it after I sold it. . . I do not know where the man lived. I was to pay him down at the Produce Row because I stayed down there a good bit and I hauled produce for a man down there, so he was to come there and get his money. I thought it was his tractor when I bought it. I told Mr. Fuller that I had bought it. He was to pay me $1.25 for it and take out 25 cents for cutting. After the cutting was done we were to settle then for the difference. The cutting was $3 an hour. On the day I went down to cut this I went down in my truck, and I hauled the scrap to the Gainesville Hide & Metal Company in my truck. It was cut up by Mr. Kelley and an assistant. I thought the person I bought the tractor from was authorized or had the right to sell it. I was paid for the scrap that I carried down there. I was paid one dollar per hundred pounds. I believe it was the next day that I first learned that this tractor

did not belong to the man from whom I bought it. The Chief of Police told me about it. He picked me up over here in the government section and carried me down to City Hall. . . I first saw this tractor when I was just riding around. I rode all over the town and Hall County. It was after I saw the tractor that I went to see Mr. Fuller. . . The day I went down there to try to find out who owned it, I went up to Mr. Paul Plaginos' house, right across from where the tractor was, and asked who owned the tractor. They said Art Sund, but it sounded like he said Sundred. Later that was the man I inquired for, Mr. Sundry. They said I might find him out on the Cleveland road somewhere and that is where I went. The first place I stopped when I went to look for the man who owned the tractor was at a filling station, right in front of Mr. Lawson's house. I asked if they knew a man by the name of Sundry and he said he didn't know whether he was there or not. . . He did go see and a man came out. I didn't ask who he was but asked him if he owned the tractor. He said he did. I asked if he wanted to sell it and he said he didn't but he would. I bought it from him for $50.00 on credit, to pay for it after I had sold it. I had never seen the man before. I was to pay him down at the Produce Row. We were to meet down there. I don't know whether the man had ever seen me before or not. That was all that happened and with that I went back and told Mr. Fuller that I had bought the tractor. . . I was sixteen years old at that time. I had already had some trouble before that about stealing some knives over here at Palmer Hardware, I did that. I didn't steal my father's car and go over to Tennessee and wreck it. . . The boy I bought the tractor from said it wasn't in running shape. He didn't say where it was, I asked him if it was down at the rock quarry and he said it was. . . I was down there when they were fixing to cut up the tractor when Mr. Plaginos came down there. Mr. O'Kelly was the man doing the cutting. I wasn't over there where they were talking when Mr. Plaginos asked what we were fixing to do. I heard him say something but I didn't know what it was, I wasn't paying any attention to what he said. The other man just told him that I had bought it." The plaintiff testified in part as follows: "I made an investigation to see who had cut up my

tractor and obtained information that led me to the place of business of Mr. K. Rozenberg at the Gainesville Hide & Metal Company. When I went there I talked to Mr. Fuller. Mr. Fuller said he had bought these parts from a boy and that he did not go out and look at the stuff; but when it begin to come in, he thought there was something wrong. Mr. Harben and I went together down to Mr. Rozenberg's and talked to Mr. Fuller, we also talked to Mr. Ed O'Kelley there. Mr. O'Kelley told me that he asked the boy if it wasn't Art Sund's tractor. That was the morning they went down there to start cutting it up, and the boy told him no, it wasn't, that he had bought it, and he says, 'I wouldn't have cut if up for anything in the world,' he says, 'if I'd known it was your tractor, but,' he says, 'I was under orders of the boss to go ahead and do it.' Mr. O'Kelley stated that he did cut it up with a cutting torch. That was at Mr. Rozenberg's place when Mr. Harben and I went down there and talked to Mr. Fuller and Mr. O'Kelley together, he said it there that morning, we were all present, that is, Mr. Fuller, O'Kelley, Mr. Harben and me. There was another man there that I didn't know." Mr. Fuller denied telling Mr. Sund that he thought there was something wrong when the junk began to come in.

1. It is well settled that this court will not reverse the grant of a new trial unless the evidence demanded the verdict rendered. We think that the evidence in this case demanded a verdict for the defendant and that, under the principle of the proposition just stated, the court erred in granting a new trial to the plaintiff. If the plaintiff had lost the case, the grant of a new trial would have been error. We can see no difference in principle where the defendant suffers a small verdict against him and elects to pay it rather than move for a new trial. It would be an idle gesture to grant a new trial on the plaintiff's motion when he could not as a matter of law prevail. *Black* v. *Lewis*, 30 *Ga*. 958; *Camp & Kemp* v. *Mayer*, 47 *Ga*. 414, 427; *Mumford* v. *Solomon*, 8 *Ga. App*. 286 (1) (68 S. E. 1075). The ruling in *Pennsylvania Lumbermen's Mutual Fire Ins. Co*. v. *Magid of Tallulah Inc.*, 54 *Ga. App*. 881 (2) (189 S. E. 552), is not contrary to the ruling herein made.

2. There is no evidence in this case which would authorize the finding that the defendant converted the tractor. His agent

did not undertake to purchase the tractor as a whole or to exercise any authority or dominion over it. The agreement was to accept and pay for parts of the tractor as junk as delivered to the defendant. If Roberts had owned the tractor and the sale had been in good faith, the facts show that the intention of the parties was that the title to the entire tractor did not pass to the defendant at any time, but that the title to the junked parts was to pass upon delivery of the junked parts and payment therefor. The converse of the ruling in *Seagraves* v. *Newbern,* 56 *Ga. App.* 437 (192 S. E. 834), applies here. The defendant exercised no dominion or control over the tractor and no conversion was shown. The demand and refusal to deliver the whole tractor did not constitute a conversion because the defendant never had possession of the tractor. The evidence shows that Mr. O'Kelley was the servant of Roberts. It is true that he was the general servant of the defendant, but the effect of the arrangement was that he was paid by Roberts and Roberts alone had authority to direct the cutting up of the tractor and he could have stopped O'Kelley at any time. *Greenberg & Bond Co.* v. *Yarbrough,* 26 *Ga. App.* 544(1) (106 S. E. 624); *Bibb Mfg. Co.* v. *Souther,* 52 *Ga. App.* 722 (184 S. E. 421), and cases cited. There is no evidence which shows a direct conversion of the tractor by the defendant, or facts showing a subterfuge on the part of the defendant to effect a conversion of the tractor indirectly. Even if the defendant did tell the plaintiff that when the junk first started to come in he felt that there was something wrong, the defendant testified that on the very first suspicion he ordered the cutting up of the tractor stopped. The evidence demanded the finding that the defendant bought the junk parts in good faith and that he did not convert the tractor. If the jury intended to award a money verdict of $200 for the junk delivered to the defendant, it was not authorized, because the action was to recover the tractor as a whole. The fact that one of the grounds of the motion for a new trial is based on the alleged newly discovered evidence that Roberts had been convicted of stealing the tractor is immaterial. If it had been shown on this trial that such was the fact, it would not have altered the fact that the defendant did not convert the tractor overtly or by indirection. Code § 20-202 precludes the plaintiff from relying on the infancy of Roberts as a ground of recovery.

The court erred in granting a new trial to the plaintiff. *Judgment reversed. Sutton, C.J., and Worrill, J., concur.*