34086, 34110. FIDELITY & CASUALTY COMPANY OF NEW YORK *v.* WINDHAM; and *vice versa.*

DECIDED OCTOBER 17, 1952—REHEARING DENIED NOVEMBER 12, 1952.

200

*Swift, Pease, Davidson & Chapman,* for plaintiffs in error.
*W. B. Skipworth Jr.,* contra.

Per Curiam. (After stating the foregoing facts.) ■ The plaintiffs in error do not contend that the claimant was not injured as found by the single director and affirmed by the Superior Court of Muscogee County. The sole contention is that the claimant was not shown to be an employee of the Co-op Cab Company as defined in § 2 (b) of the act of 1920 (Ga. L. 1920, p. 167) as amended by the acts of 1943 (Ga. L. 1943, pp. 401, 402) and 1950 (Ga. L. 1950, pp. 324, 405) ; Code, Ann. Supp., § 114-101: " 'Employee' shall include every person in the service of another under any contract of hire or apprenticeship, written or implied, except one whose employment is not in the usual course of the trade, business, occupation or profession of the employer and, except as hereinafter provided, minors are included even though working in violation of any child labor law or other similar statute: Provided, that nothing herein contained shall be construed as repealing or altering any, such law or statute," etc. (Remainder not material here.)

The following evidence was undisputed: Co-op Cab Company is a corporation of Muscogee County, Georgia, and operates under its corporate name, which is printed on each of a number of taxicabs owned by it. These taxicabs are operated by licensed drivers, under arrangements with the company, on

what is termed a "rental" of $6.50 per day. A driver retains all money received from passengers as fares except the $6.50 per day "rental." The company operates an office and waiting room for passengers, where calls are received and dispatched to the drivers by telephone and radio system. The company pays all license fees except the drivers' personal licenses for individual driving, all taxes, and carries liability insurance in connection with the operation of the cabs, furnishes the oil and upkeep of the cabs, and reserves the right to refuse to "rent" a cab to a driver not licensed by the city to drive or to a driver guilty of drunkenness or one who has been found guilty of a violation of a traffic regulation. The drivers collect fares from passengers in accordance with rates prescribed by the City of Columbus. The claimant here furnished his own gasoline, his own cab driver's license from the police department, paid his own fine in case of an arrest and conviction of a traffic violation. Neither the claimant nor any other driver was carried on the company's journal showing its payroll of salaried employees. The company never paid the claimant any money from its own hands, but he paid it $6.50 a day, as hereinbefore stated, which he testified he paid from receipts at the end of the day. The major portion of the stock in the Co-op Cab Company, a corporation, was owned by C. D. Shine and a Mrs. Locke. They also owned the business at which the claimant obtained gasoline for the cab he was to drive. The cab company does not have a workmen's compensation policy covering cab drivers. On July 17, 1950, the claimant was working with or driving a cab obtained from the cab company. He became a user of their cabs in May, 1950, and had continued to operate a cab on and off for several years. The company has 70 or 80 cabs in use. The claimant drove seven days a week in different shifts, working all over Columbus, Georgia, and Phoenix City, Alabama, wherever the passengers wanted to go. He was obliged to pay $6.50 per day for the use of the cab whether or not he worked.

On the question of whether or not the claimant was under any control of the cab company in the operation of his cab, the evidence was conflicting, but there was evidence on behalf of the claimant as follows: The claimant testified: "I was hired to drive a cab for the company. Under the hiring I was

required to carry passengers wherever they wanted to go. . . I was also required to buy my gas from the company. . . Each cab is equipped with a two-way radio, and going to some part of the town I had to call in to the main switchboard operator and check into what part of town I was going. They would call me and give me a call to pick up a passenger and carry him to his destination. I was required to buy gas from the company. If I bought my gas any other place other than the company the manager told me I would be fired. In the event I did not follow instructions by radio the manager told me I would be fired. . . The company manager assigned the cab. . . If I didn't work regular I had to pay the service charge on the cab right on. . . I paid every afternoon when I came off duty. . . The manager told me if I didn't buy gas from the company I would be fired under the terms of the contract. . . When I had a radio call I was forced to answer it. I could either make the call or they would park my cab. . . The fares I took in went to pay my service charge for the day and pay for the gasoline that I burned during the day. Any amount above that was my salary. . . I guess you would call it salary. I was out there working for it. . . The manager of the company, Mr. John Landers, told me when to go to work and when to quit. . . I stopped for supper when I went home after I got off from work. As to my other meals while I was paying my twelve hour rental lick—if I wanted to get a meal I stopped when I wanted to, check out of service. There was no definite length of time that I could take out. . . You had to go wherever they told you to go to pick up passengers, wherever the man on the radio told you to go to pick up passengers. . . As to whether if I wanted to take a cab out of service an hour ahead of time I could do it—yes, sir, you can check out. . . The driver can knock off when he wants to just so he pays that $6.50 and the gas. . . As to knocking off at any time that I saw fit—all the time I worked for the cab company I was subject to the rules and regulations of the cab company."

Charlie Foster, a driver, testified in part: "As to whether in the event the cab company notifies me that a passenger is waiting and I fail to answer the call and as to what disciplinary

action they will take—you will have to have some excuse for that. You are supposed to make a call if you are given it. . . If you get out there and call a cab and they give me your call on the radio, well, I am supposed to make that call to keep you from waiting, see, because if I don't make it then you have got to go and call another cab. They would naturally have to have some disciplinary action in a case of that kind. . . All the taxicabs are uniformly painted on each side with the name of the company and the telephone number of the company."

In determining the relationship of employer and employee in compensation cases, the usual and generally accepted rule is that stated in *Liberty Lumber Co.* v. *Silas,* 49 *Ga. App.* 262 (2) (175 S. E. 265): "In claims for compensation under the Workmen's Compensation Act, where the question is whether the injured person, or the person under whom he was working, occupied the relation of an employee or of an independent contractor toward the alleged employer, the line of demarkation is often so close that each case must be determined upon its own particular facts. The chief test to be applied, however, in determining whether the relationship of the parties under a contract for the performance of labor is that of employer and servant, or that of employer and independent contractor, lies in whether the contract gives, or the employer assumes, the right to control the time, manner, and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract." See also *Maryland Casualty Co.* v. *Radney,* 37 *Ga. App.* 286 (139 S. E. 832); *Home Accident Ins. Co.* v. *Daniels,* 42 *Ga. App.* 648 (2) (157 S. E. 245); *Bibb Mfg. Co.* v. *Souther,* 52 *Ga. App.* 722 (184 S. E. 421). "If the right of control be conclusively shown to exist, then evidence to show the actual exercise of control or the absence of it, becomes wholly immaterial. It is the right of control, and not the fact of control, which is decisive." *Studdard* v. *Phoenix Indemnity Co.,* 79 *Ga. App.* 467, 471 (54 S. E. 2d, 280). To effectuate the beneficent purpose of the act, it has been held that the word "employee" must be liberally construed in favor of the claimant. *Continental Casualty Co.* v. *Haynie,* 51 *Ga. App.* 650, 652 (4) (181 S. E. 126). In fact, it has many times been held that the entire act should be so construed. As some-

times stated, where a doubt exists as to whether the claimant was an employee or independent contractor, the doubt should be resolved in his favor. *Liberty Mutual Insurance Co.* v. *Henry,* 56 *Ga. App.* 868, 870 (194 S. E. 430); *Glens Falls Indemnity Co.* v. *Clark,* 75 *Ga. App.* 453, 459 (43 S. E. 2d, 752).

While the evidence was in conflict as to whether or not the cab company exercised or reserved the right to exercise any control over the time, manner and method of the service performed by the claimant, the single director and the superior court were authorized to find therefrom that there was in fact such a reservation of control. The claimant testified that, when he was engaged or employed by the company, he was required to carry passengers where they wanted to go, and that instructions were dispatched to him by radio by the company, and that he was required to buy all of his gasoline from a named station, which was owned by the same persons who owned a majority of the stock of the cab company. He was told by the manager when to go to work and when to quit, and he was informed by the manager that if he did not carry out instructions he would be discharged. Certainly this means that his preference as to the use of his cab and what gasoline to use would have to be subordinated to the company's orders on pain of dismissal if violated. According to his testimony, what cab he should drive on each day was determined by the company and not by him. These reservations of control of the details of the operation of cabs by the claimant, if in fact existing, and as the single director was authorized to find, established him as an employee and not as an independent contractor.

The claimant testified, in response to questions by counsel for the cab company, that there was no definite length of time that he could take out; that if he wanted to take a cab out of service an hour ahead of time, he could do so, and that he could knock off when he wanted to just so he paid the $6.50 and filled the tank of the cab with gasoline. It might be urged that this portion of his testimony is repugnant to any idea of control; and that, construing his testimony against him, it should be said that he was not subject to any control of the company. However, the fact that he had some discretion as to his hours of labor is not conclusive of independent contractorship or other

relationship foreign to that of master and servant. Shannon *v.* Western Indemnity Co. (Texas Com. of App.), 257 S. W. 522; Maryland Casualty Co. *v.* Kent (Texas Com. of App.), 3 S. W. 2d, 414. But we are not left to depend alone on such a legal concept, because it clearly appears from the evidence that such liberties as mentioned were not absolute, but were conditioned on the absence of conflicting instructions from the company. In the concluding part of his testimony, he was asked the following question by his counsel: "Mr. Windham, during the time that Mr. Pease has been questioning you on this particular item that you could knock off at any time that you saw fit, all the time that you worked for the cab company you were subject to the rules and regulations of the cab company, were you not?" He answered, "Yes sir." A proper construction of his testimony is that it was only when he had no counter-instructions from the company that he could "knock off" at his pleasure. In other words, if he formed an intention to "knock off" for a period of time, but at that juncture a call came for him to pick up a certain passenger, and he ignored such instructions and pleased himself, he would be subject to dismissal. Thus did the right of control persist.

Much stress is laid by counsel for the plaintiffs in error on the fact that the claimant paid a "rental" of $6.50 per day for his cab, that the company paid him nothing, and that whatever he earned came from receipts from passengers, and, hence, he was an independent contractor. The fact that he paid such "rental" does not necessarily militate against a finding from other evidence that he was in fact an employee. It is a circumstance to be taken into consideration with other evidence, but is not itself conclusive of the relation of independent contractorship, the better and generally accepted test being that of control or right of control of the time, manner, and method of his work. When by that better test he is placed in the category of a servant or employee, the inquiry ends in the present case as to his right to compensation. Many cases involving taxicab drivers are cited and relied upon by counsel for the plaintiffs in error as showing the relationship of an independent contractor. While in those cases there was a rental of the cab,

there was no evidence whatever of control as here, and they are not controlling and, therefore, are not referred to in detail.

In an extensive search we have been unable to find any compensation case on "all fours" with the present one. As showing, however, that rental of itself does not establish one as an independent contractor where there is a concomitant right of control, we might refer to Glielmi *v.* Netherland Dairy Co., 254 N. Y. 60 (171 N. E. 906). There a person rented a wagon and horses from a dairy company and used them in selling the company's milk and cream. He paid a stated price per day for the use of the wagon and horses, and from the proceeds of his sales he was allowed to retain 4 cents per quart for the milk sold and 3 cents per half pint for the cream sold. Here was a case of as much "rental" as in the present case; but, because there was evidence of control as mentioned in the opinion, the Court of Appeals of New York held that the claimant was the servant of the dairy company and entitled to compensation. In the present case, we have a situation where the cab company and the claimant entered into an arrangement under which it was obviously intended that each receive some compensation for his respective contribution to the enterprise. With respect to the claimant, as was said in *New Amsterdam Casualty Co.* v. *Sumrell,* 30 *Ga. App.* 682, 684 (118 S. E. 786), where a salesman traveled in his own automobile and was responsible for all the expenses of his travel, "While these facts and also the *method of his compensation* are to be considered in determining whether the relation of employer and employee existed, they are circumstances only; for the test must lie in a more important matter—namely, the power of control reserved to the proprietor over the conduct of the work which the decedent was to do." (Italics ours).

While not a compensation case, but one brought under the Georgia Unemployment Law, the facts in *Redwine* v. *Wilkes,* 83 *Ga. App.* 645 (64 S. E. 2d, 101), are almost identical with those in the present case, and on principle that decision fixes the relationship of the claimant as an employee. It was there ruled: "Where, as here, one obtains a city franchise as a common carrier under the provisions of which he operates under a firm name as a taxicab company, and owns and operates a place of

business with waiting room for patrons and telephone switchboard, including telephone-relay system, throughout the city as call stations to inform the drivers of calls; pays all license fees, taxes and insurance, owns all taxicabs and has them uniformly painted with the name and telephone number of his company thereon, and reserves and exercises the right to dismiss drivers for discourtesy, reckless driving or other causes—an arrangement between such person and the drivers whereby the drivers pay a fixed sum per diem to the company and retain all sums in excess thereof paid to them as fares (the rate of such fares being also fixed by the owner) is not a mere rental agreement, but such drivers are the employees of the company under the terms of the Unemployment Compensation Law."

Under the authorities above cited, we hold that the single director and the superior court were authorized to find that the claimant was an employee of the Co-op Cab Company and entitled to compensation.

■ The single director found that the claimant was earning $45 to $60 per week and entered an award of $24 per week for the period hereinabove stated. The superior court ruled that there was no evidence to sustain the finding, but held that there was evidence authorizing a finding of $25 per week, and set aside the award of $24 per week and entered an award of $12.50 per week for the period hereinabove stated. To that part of the judgment the claimant excepted. While the claimant on direct examination stated that he earned from $45 to $60 per week, he showed on cross-examination that he had no knowledge or record of earnings sufficient to form any basis for calculating an award under the act of 1922 as amended, supra (Code, Ann. Supp., § 114-402). There was testimony, however, from other drivers for the cab company to the effect that for a period of 13 weeks prior to the injury of the claimant on July 17, 1950, they earned from $20 to $30 per week, and this testimony was sufficient basis under section (2) of the act as amended for an award of $12.50 per week, and the court did not err in fixing the award accordingly.

Because of a dissent by one of the Judges, this case was considered by the entire court.

*Judgments affirmed on both bills of exceptions. Sutton, C. J., Gardner, P. J., Townsend, Worrill and Carlisle, JJ., concur. Felton, J., dissents.*

FELTON, J., dissenting. The evidence established that the Co-op Cab Company operated on what is commonly called the "lick system," whereby the company rented to the driver a cab equipped with a two-way radio for a sum of $6.50 per twelve hours. In addition to the rent the driver had to furnish his own gasoline. The driver kept all the fares he collected and did not have to account to the company for such fares. The claimant testified that the drivers were required to buy gasoline from the company while other drivers testified that drivers were not required to purchase company gasoline. As to the operation of the cabs, it was shown that the company maintained a telephone switchboard, and when a request for a cab was received over the switchboard, a cab was notified of the request via radio by the dispatcher. It was attempted to be shown by the claimant's testimony that the company controlled the time, manner, and method of the driver's operation of the cab so as to render the driver an employee of the company. The claimant testified: "Q. All right, you say when you had a radio call you were forced to answer that call? A. Yes, sir. Q. They made you? A. Yes, sir. You could either make the call or they would park your cab, either one. . . Q. Who told you when to go to work and when to quit? A. The manager of the company, Mr. John Landers. . . Q. How long did you take for your lunch? A. It varied from time to time. I wouldn't say no certain length of time. Q. As I understand when you got ready you stopped for supper? A. Stopped for supper when I went home after I got off from work. Q. All right. Now for your other meals then while you were paying your twelve hour rental lick if you wanted to get a meal did you stop when you wanted to? A. Yes, sir, check out of service. Q. Was there any definite length of time that you could take out? A. No, sir. . . Q. If you wanted to take a cab out of service an hour ahead of time could you do it? A. I don't guess you would want to take it out of service an hour ahead of time. Q. I asked you if you wanted to take it out an hour ahead of time could you check out? A. Yes, sir, you can check out. Q. Then

you were not forced to keep the cab in continuous operation during the entire twelve hours were you?ᐧ A. It is left up to the driver, I guess. *Q. And he can knock off when he wants to just so he pays that $6.50? A. And the gas.* Q. It is turned over to you with a full tank of gas, is that right? A. Yes, sir. Q. And when you turn it back in you fill the tank up for the next driver? A. Yes, sir. Q. And if you want to you can knock off after serving six, eight or ten hours, just so long as you pay your money and fill the tank up? A. Yes, sir." There was testimony by the company's general office manager and other company drivers that a driver was not required to purchase gasoline from the company; that they did not have to respond to the company's radio calls, that they did not have to report out of service; and that they were free to come and go as they pleased. The evidence also disclosed that if a driver did not take in enough fares to cover the rental charge and the gasoline, the driver had to pay for the same out of his own pocket. Witnesses for the company testified: "Q. In the event that they notify you that a passenger is waiting and you fail to answer the call what disciplinary action will they take? A. Well, you will have to have some excuse for that. You are supposed to make a call if you are given it. Q. Then there is disciplinary action in a case of that type? A. Well, that question could be answered a couple of ways maybe. If you get out there and call a cab and they give me your call on the radio, well, I am supposed to make that call to keep you from waiting, see, because if I don't make it then you have got to go and call another cab. Q. Then they do have some disciplinary action they take in a case of that kind? A. They would naturally have to have, yes, sir."

While the claimant testified that his actions in operating the cab were controlled by the company, he also testified that he could "knock off" any time he wanted to. The claimant's testimony was contradictory and must be construed against him. So construing his testimony—he could quit for the day any time he wished whether the company wanted him to or not, and could work at his pleasure. I think that the evidence demanded a finding that the claimant's time, manner, and method of operating his rented cab were not controlled by the company so as

to render him an employee of the company within the meaning of Code § 114-101. The only reasonable inference from the evidence is that the only disciplinary action the company could take when a driver refused to pick up a passenger when the request was relayed by radio would be to refuse to rent a cab to that driver thereafter. This refusal thereafter to rent a cab would not amount to a control of the time, manner, and method of the operation of the cab by the company.

The claimant relies on the case of *Redwine* v. *Wilkes*, 83 *Ga. App.* 645 (64 S. E. 2d, 101), wherein the facts were somewhat similar to those in the instant case. The court there held that an employer-employee relationship existed *under the terms of the Unemployment Compensation Act*. A different criterion is used in that act in determining employer-employee relationships from that used in the application of the Workmen's Compensation Act. The former act establishes its own standard for determining the relationship (Code, Ann. Supp., § 54-657 (h) (6)), whereas the relationship under the latter act is determined by common-law principles. *Travelers Ins. Co.* v. *Clark*, 58 *Ga. App.* 115, 121 (197 S. E. 650). In passing the Unemployment Compensation Act, the General Assembly declared the public policy of the State in relation to the application of the act which greatly liberalized such application. Code (Ann. Supp.), § 54-602. It was stated in *Young* v. *Bureau of Unemployment Compensation*, 63 *Ga. App.* 130, 137 (10 S. E. 2d, 412): "It is immaterial whether the parties come within the relation of master and servant or independent contractors. The act itself fixes the status of their employment which brings them within the terms of the act, and renders the employer liable for the contributions required by the act." The court there further stated: "As stated by the Supreme Court of Washington in McDermott *v.* State, 196 Wash. 261 (82 Pac. 2d, 568), in construing an act similar to the Georgia act, 'It is unnecessary to determine whether the common-law relation of master and servant exists between respondent and the barbers and other operatives in his shop, because the parties are brought within the purview of the unemployment-compensation act by a definition more inclusive than that of master and servant.'" Therefore, facts may exist which would render a relationship

one of employer-employee under the provisions of the Unemployment Compensation Act, but which would be insufficient to establish such a relationship under the Workmen's Compensation Act.

Construing the claimant's testimony most strongly against him, the undisputed facts show that the claimant came to work when he wished, quit work when he wished, and kept all his fares, and show that the company only received the rental charge of the cab plus whatever profit it made from the sale of gasoline to the drivers, and show that if the amount of the fares received by the drivers was less than the rental charge and the cost of gasoline, the drivers bore the loss. I think that these facts are inconsistent with the relationship of employer and employee.