**Marvin A. BALL, Appellee,**

v.

**David MATHEWS, Secretary of Health, Education, and Welfare, Appellant.**

**No. 76–1727.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 12, 1977.

Decided Oct. 26, 1977.

William M. Reinhart, Asst. Regional Atty., Dept. of Health, Ed. & Welfare, Philadelphia, Pa. (Paul R. Thomson, Jr., U.S. Atty., E. Montgomery Tucker, Asst. U.S. Atty., Roanoke, Va., and Stephanie W. Naidoff, Regional Atty., Philadelphia, Pa., on brief), for appellant.

Alfred G. Morici, West Palm Beach, Fla. (James R. Moore, Abingdon, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and BRYAN and FIELD, Senior Circuit Judges.

FIELD, Senior Circuit Judge:

The claim of Marvin A. Ball for pneumoconiosis benefits under the Federal Coal Mine Health and Safety Act of 1969 (Act), as amended, 30 U.S.C. § 901, et seq., was denied by the Secretary of Health, Education, and Welfare (Secretary) upon the ground that Ball had failed to establish that his condition had arisen out of employment in a coal mine as required by the Act.[1] The district court reversed this administrative determination[2] and the Secretary has appealed.

Under the Act, if a miner who is totally disabled due to pneumoconiosis was employed for ten years or more in one or

---

1. 30 U.S.C. § 902(b) defines "pneumoconiosis" as "a chronic dust disease of the lung arising out of employment in a coal mine."

2. *Ball v. Mathews*, 412 F.Supp. 241 (W.D.Va. 1976).

more coal mines, he is entitled to a rebuttable presumption that his condition arose out of such employment. 30 U.S.C. § 921(c)(1). However, the Act defines a miner as "any individual who is or was employed in a coal mine,"[3] and it is clear from this as well as the other statutory definitions, that to qualify for benefits under the Act a claimant must show not only that his disabling disease resulted from his work in the mines, but that such work was performed in the capacity of an "employee" which is defined in the Secretary's regulation, 20 C.F.R. § 410.110, as follows:

"(m) 'Employee' means an individual in a legal relationship (between the person for whom he performs services and himself) of employer and employee under the usual common-law rules.

In addition, the regulations suggest various tests to determine the existence of an employment relationship:

"(m)(1) Generally, such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the means by which that result is accomplished; that is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case are the furnishing of tools and the furnishing of a place to work to the individual who performs the services."

Conversely, the regulations set forth guidelines to determine the absence of an employment relationship:

(m)(1) " * * * In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under the usual common-law rules.

Finally, the regulations provide:

"(m)(2) Whether the relationship of employer and employee exists under the usual common-law rules will in doubtful cases be determined upon an examination of the particular facts of each case."

The Administrative Law Judge (ALJ) found that Ball was totally disabled due to pneumoconiosis, but that he was not entitled to the benefit of the statutory presumption since he did not have the requisite ten years of work in a coal mine as an "employee" as defined by the Secretary. Pivotal to this finding was the conclusion of the ALJ that the plaintiff's work in a mine owned by Jewell Coal Company during the period from 1955 to 1969 was performed as an independent contractor and not as an employee. The district judge, however, determined that the undisputed facts showed that Ball had worked during that period as an employee of the coal company rather than as an independent contractor.

The evidence relative to this issue was largely undisputed. Jewell Coal Company opened the mine and built an adjacent tipple in 1954. In 1955 the claimant and his two brothers entered into an oral agreement with Jewell under which they, together with miners employed by them, would work the mine and be paid a fixed amount per ton for the coal which they delivered to the tipple. Under this agreement Ball and his brothers were required to deliver the coal only to Jewell, and during the entire fourteen year period their earnings were derived solely from the coal which they mined for Jewell. Jewell, of course, owned the tipple and also owned all of the equipment which was used in the mining operations. Jewell paid for the repairs on this

---

**3.** 30 U.S.C. § 902(d).

equipment and the charges for electrical service, and Jewell's engineer supervised the engineering and technical structures of the mine. During the entire period Jewell provided workmen's compensation coverage for the claimant and his brothers, as well as the miners hired by them to assist in the operations. While Ball and his brothers supervised the work of the other employees, they also ran machinery, loaded coal with shovels and did any other type of work which was required either inside or outside the mine incident to the mining operation.

Ball and his brothers knew very little about taxes or accounting, and employed an accountant to keep their books and records and prepare the necessary tax returns. The books were kept on a partnership basis, and the three brothers paid their own social security taxes and quarterly income taxes on an estimated basis as self-employed individuals. They ordinarily employed four or five men to assist them in the mining operations and the partnership paid the social security taxes on these miners based upon their earnings for each quarterly period. Ball's annual earnings under the arrangement were somewhere between six and seven thousand dollars.

■ The Secretary contends there is substantial evidence in the record to support his conclusion that the plaintiff was an independent contractor and, accordingly, that this finding was binding upon the district court. We do not think, however, that the simplistic application of this general principle of administrative law is appropriate in the case before us for we agree with the district judge that this was not a purely factual finding by the Secretary, but involved the application of well established principles of law to facts which were not in dispute. The Court has recognized that administrative agencies have been assigned the primary task of determining the con-

tours of the term "employee", but it has "never immunized [their] judgments from judicial review in this respect," *Chemical Workers v. Pittsburgh Glass*, 404 U.S. 157, 166, 92 S.Ct. 383, 391, 30 L.Ed.2d 341 (1971). While the Secretary's determination that an individual is an employee under the Act "is to be accepted if it has 'warrant in the record' and a reasonable basis in law," [4] there is no reason why the court should yield to the Secretary's decision if it appears that the application of the law to the facts requires a different result.[5]

The ALJ recognized that there was a serious question as to the exact nature of the relationship between the claimant and Jewell Coal Company, but despite considerable equivocation on the point, he concluded that the "thrust of the agreement [between Ball and Jewell] was that the claimant was a 'defacto' [sic] employer." In reaching this conclusion the ALJ placed considerable emphasis on the fact that during the years in question Ball and his brothers had reported their income to the tax authorities as self-employment income and, additionally, that a letter from Jewell to the Social Security authorities indicated that the three brothers worked in a self-employed status on the coal leases of the company.

■ In our opinion it was inappropriate for the ALJ to place such heavy reliance upon the statement attributed to an unlettered coal miner in his tax returns and Jewell's somewhat self-serving statement, for the issue of whether Ball was working as an employee or was engaged in an independent operation turned upon something more than these conclusory characterizations. Some thirty years ago in *United States v. Silk*, 331 U.S. 704, 716, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947) the court stated:

"Probably it is quite impossible to extract from the statute a rule of thumb to

---

4. *NLRB v. Hearst Publications*, 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944).

5. We recognize that the courts accord considerable deference to an administrative agency's interpretation of its regulation, *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13

L.Ed.2d 616 (1965). However, such deference is considerably diluted in the present case since the Secretary's regulation merely catalogues criteria which have long been applied by courts in making a determination whether an individual is an employee or an independent contractor.

define the limits of the employer-employee relationship. The Social Security Agency and the courts will find that degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete."

When the record before us is viewed in the light of these criteria, we think it is clear that during the years in question Ball labored in the mine as an employee and not as an independent contractor. It was Jewell's capital which was invested in the mine and equipment and, likewise, it was Jewell who paid for the electrical energy and repairs incident to the operation. Nothing in the record indicates that the agreement provided Ball with the opportunity for profit or other factors ordinarily associated with an entrepreneurial activity. A distillation of all of the relevant facts indicates that the agreement between Jewell and the Ball brothers was designed to provide nothing more than the labor which was required to mine the coal and deliver it to the company's tipple. That such was the nub of the arrangement is manifest by the fact that Jewell took the steps necessary to protect itself as an employer by effecting workmen's compensation coverage upon Ball and his brothers, as well as the other miners, during the entire fourteen years.

Concededly, Ball's status was something less than crystal clear, but it is our opinion that upon the record before him the ALJ should have applied the principle that where there is doubt with respect to a claimant's status as an employee or an independent contractor, the doubt should be resolved in the claimant's favor. This principle which has long been followed by the state courts in the area of workmen's compensation law,[6] accords with the humanitarian objectives of this black lung legislation.

One final observation. It is true, of course, that the agreement between Ball and the coal company was initiated many years prior to the Act, and such legislation was not within the contemplation of the parties. Nevertheless, in our opinion, it would be most unwise to countenance an arrangement which could be used by mine owners to escape the burdens of the Act and result in the denial of benefits to numbers of coal miners who would otherwise be entitled thereto. In the context of the Social Security Act, such a possibility was discerned by the Court in *Silk, supra*, where the Court stated:

"[T]he terms 'employment' and 'employee,' are to be construed to accomplish the purposes of the legislation. As the federal social security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose. Such an interpretation would only make for a continuance, to a considerable degree, of the difficulties for which the remedy was devised and would invite adroit schemes by some employers and employees to avoid the immediate burdens at the expense of the benefits sought by the legislation. These considerations have heretofore guided our construction of the Act." (Footnote omitted). 331 U.S., *supra*, at 712, 67 S.Ct. at 1467.

In our opinion the Secretary's conclusion in this case was the result of a "constricted interpretation" and, accordingly, the judgment of the district court is affirmed.

*AFFIRMED.*

HAYNSWORTH, Chief Judge, dissenting:

I respectfully dissent.

---

6. *Irvan v. Bounds*, 205 Ark. 752, 170 S.W.2d 674 (1943); *Fidelity & Cas. Co. of N.Y. v. Windham*, 87 Ga.App. 198, 73 S.E.2d 517 (1952), *rev'd on other grounds*, 74 S.E.2d 835, 209 Ga. 592 (1953); *Daggett v. Nebraska-Eastern Express, Inc.*, 252 Iowa 341, 107 N.W.2d 102 (1961); *Meek v. Julian*, 219 Ind. 83, 36

N.E.2d 854 (1941); *Southard v. Kleinsmith*, 19 N.J.Misc. 109, 17 A.2d 788 (1941); *Kamarad v. Parkes*, 201 Tenn. 566, 300 S.W.2d 922 (1957); *Myers v. Workmen's Compensation Com'r.*, 150 W.Va. 563, 148 S.E.2d 664 (1966); 99 C.J.S. § 91 and cases cited therein.

The majority recognizes that deference is due the findings and conclusion of the Secretary in resolving this mixed question of fact and of law. In reversing, however, the majority can point to no error of law which influenced the decision of the Secretary. What it does is to take a different view of the facts, which, though substantially undisputed, can become colored in the process of a selective statement of them. In my view, the Secretary's statement of the facts was more balanced, and should be accepted by this court.

Ball and his brothers were not paid wages or anything resembling wages. They were paid a fixed sum per ton of coal delivered to the tipple. Whether the partnership made profits, and the amount of those profits, depended upon the volume of coal the partnership could deliver, and the costs incurred by the partnership in the extraction and delivery of that coal. The contract did not stipulate the number of miners to be employed by the partnership, or the wages to be paid them. In these days, there are limits to which any employer may hold labor costs down on an hourly basis, but within those limits, the partnership was free to keep its hourly labor costs low or to pay some premium for exceptionally productive employees. The management of the work was for the partnership, and the amount of the partnership's earnings was in direct relationship to the quality of the performance of the partnership in the discharge of its managerial function.

Moreover, the parties were in complete agreement that they intended an independent contractual relationship in which Jewell Coal Company would have no right to direct or control the manner in which the work was done. Its sole interest was that coal be produced and delivered to the tipple. *See Kinty v. United Mine Workers of America*, 544 F.2d 706 (4th Cir. 1976). How and when it was done was up to the partnership. Thus, before any possible dispute about black lung disease appeared on the horizon, Jewell solemnly reported that the parties maintained an independent contractual relationship, and the partnership recognized this relationship by paying self-employment taxes on the earnings of the partners and social security taxes on the earnings of its employees. I cannot look upon the partnership actions in discharging these tax obligations of an independent contractor as an inadvertence on the part of an uneducated coal miner. Relatively uneducated employers are not likely to pay tax obligations unless they are convinced that the law requires it. Moreover, the partnership employed its own accountant. The conduct of the partners was entirely consistent with the expressed conclusion of Jewell Coal Company that the mutual intent of both parties was to create an independent contractual relationship in which Ball Brothers was to manage its business free of control by Jewell and to reap and retain what profits would accrue from good management of the work.

The case would be perfectly clear and beyond dispute had Jewell not provided capital investment and engineering services for the Ball Brothers, paid their electricity bill, and included the partners and their employees in its workmen's compensation coverage. These seem to me of no great significance in deciding where the right to control lay, for such arrangements were simply the practical consequence of economic considerations.

The partner's mining operation was simply not large enough to justify the employment of a full time engineer. Anticipated cost of part-time engineering services by Jewell's employee was doubtless reflected in the tonnage price, and one would suppose that any reduction in price that resulted cost the partnership less than the fee it would have had to pay to procure the services of an independent engineer, if there were such a person in the vicinity. Similarly, placing the cost of electricity on Jewell probably represented a net savings to both parties, as would inclusion of these people in Jewell's workmen's compensation insurance. It seems obvious to me that the parties intended that Jewell would assist the partnership in obtaining electric power, part-time engineering service, and workmen's compensation protection at minimal

cost to the partnership. That kind of assistance does not convert an independent contractual relationship into one of employer and employee. Surely that should not be the case when the basic arrangement compensated the partnership on the basis of so many dollars per ton of coal delivered to the tipple and where the profits of the partnership depended on the quality of its managerial performance and the productivity it could achieve in the work of the partners and their employees.

It is also true, of course, that Jewell provided the capital investment in the mine and its equipment. There is no indication that Ball Brothers had the financial resources to have made any such capital investment, but there again that circumstance was surely reflected in the agreed tonnage price. Moreover, it is not unusual for a businessman to seek initial capital financing from persons who will derive a direct economic benefit from the successful operation of a proposed business. Neither alone, nor in combination with the other services for which Jewell paid, is it enough to override the clear fact that the business of the partnership was entrepreneurial, and that the mutual intention of the parties was that control of the work and the manner in which it was done was vested in the partnership.

There is a suggestion in the opinion of the majority that resort to such arrangements might be a means to defeat in part the beneficent purposes of the pneumoconiosis legislation. This arrangement long antedated that statute, however. If there is anything after enactment of that legislation which indicates a resort to subterfuge to partially avoid liabilities under the statutes, the Secretary and his hearing officers will know about it long before we, and he will be quite free to strike those arrangements down. Meanwhile, we are reviewing his fact finding and determination of a mixed question of law and fact. I think we should recognize the facts as found by the Secretary, those strongly pointing in support of his conclusion, as well as those which point in the other direction. The Secretary did weigh all the facts, and I can find no fault with the manner in which he weighed the facts in coming to his conclusion.

Under those circumstances, I believe that the Secretary's conclusion is binding upon us.