Charles H. MOORE, Appellant,

v.

Patricia R. HARRIS, Secretary of Health & Human Services, Appellee.

No. 78–1610.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 7, 1979.

Decided June 12, 1980.

Daniel M. Hall, Abingdon, Va., for appellant.

Fred Marinucci, Dept. of Health & Human Services, Philadelphia, Pa. (Paul R. Thomson, Jr., U. S. Atty., Robert S. Stubbs, Asst. U. S. Atty., Roanoke, Va., Stephanie W. Naidoff, Regional Atty., Joan Kaehne Garner, Region III, Dept. of Health & Human Services, Philadelphia, Pa., on brief), for appellee.

Before HALL and MURNAGHAN, Circuit Judges, and PERRY*, District Judge.

* The Honorable Matthew J. Perry, United States District Judge for the District of South Carolina, sitting by designation.

1. Pub.L. No. 91–173, §§ 401–426, 83 Stat. 742 (current version at 30 U.S.C.A. §§ 901–945 (West Supp. 1979)).

2. See 30 U.S.C.A. § 901(b) (West Supp. 1979).

3. Such employment by the close corporation merits no less favorable treatment of a claimant under the Black Lung Benefits Act than does self-employment. See Montel v. Weinberger, 546 F.2d 679, 682 (6th Cir. 1976) (McCree, J., dissenting).

MURNAGHAN, Circuit Judge:

In 1971 Charles H. Moore, appellant, sought black lung benefits under the Black Lung Benefits Title of the Federal Coal Mine Health and Safety Act of 1969[1] ("Black Lung Benefits Act"[2]). The claim was denied by the Secretary of Health, Education and Welfare, now the Secretary of Health and Human Services ("the Secretary"), whose action was sustained by the district court as supported by substantial evidence.

The problem which confronts us is whether nearly a decade of activity as a miner while Moore was self-employed in a family mine or employed by a close corporation of which he was a principal shareholder[3] should be considered for purposes of certain favorable presumptions established by statute to determine eligibility. We hold that it should be so considered and reverse. Considering those years of self-employment gives Moore over fifteen years of coal mine employment, as against the less than ten years allowed by the Secretary for periods when Moore's mining activities took place while he was the employee of mine operators other than himself and his close corporation.

I

*The Statute.*

The case is governed by the provisions of the act as they existed prior to amendment in 1978.[4] Under those provisions, benefits

4. The earliest date as of which benefits might be calculated if Moore were to succeed in the present claim is the date his claim was filed, April 23, 1971. See 30 U.S.C. § 924(c) (1976). By its own terms, the relevant portions of the Black Lung Benefits Act of 1972 were made retroactive to December 30, 1969. Pub.L. No. 92–303, § 4(g), 86 Stat. 150. The further liberalization effected by the provisions of the Black Lung Benefits Reform Act of 1977, Pub.L. No. 95–239, 92 Stat. 95 (1978) (under which Moore's self-employment would clearly count for purposes of the statutory presumptions) does not extend to claims such as this one, which was instituted prior to 1974 under Part B of the pre-1978 act. Treadway v. Califano, 584 F.2d 48 (4th Cir. 1978) (en banc). If Moore

shall be paid with respect to the disability of a person if four requirements are satisfied:[5]

1. The person must be a *miner*, which the statute defines as "any individual who is or was employed in a coal mine."[6]

2. The person must be *totally disabled* as determined by regulations prescribed by the Secretary.[7]

3. The total disability must be *due to* pneumoconiosis, "a chronic dust disease of the lung."[8]

4. It must be shown that the disease is one *"arising out of* employment in a coal mine."[9]

To facilitate the administration of the act and to ease the inherent difficulties of proving the existence and the causation of the disease, the statute makes available several presumptions to help establish requirements

2, 3, and 4 above. Thus, "if a miner is suffering . . . from a chronic dust disease of the lung which [yields specified medical symptoms when diagnosed by X-ray, biopsy, or other means], then there shall be an irrebuttable presumption that he is totally disabled due to pneumoconiosis . . ."[10] ("the irrebuttable presumption"). That is, requirements 2, 3, and 4 are deemed satisfied.

Also, "if a miner was employed for fifteen years or more in one or more underground coal mines, and if [a chest X-ray fails to meet the standards of the irrebuttable presumption], and if other evidence demonstrates the existence of a totally disabling respiratory or pulmonary impairment, then there shall be a rebuttable presumption that such miner is totally disabled due to pneumoconiosis . . ."[11] ("the fifteen-year presumption"[12]). That is, re-

were ultimately to lose this claim, he would be able to file a claim for review under the 1978 act, which, however, would be retroactive only to January 1, 1974. 30 U.S.C.A. § 945 (West Supp. 1979).

5. *See* 30 U.S.C. § 921(a) (1976) ("The Secretary shall, in accordance with the provisions of this part, and the regulations promulgated by him under this part, make payments of benefits in respect of total disability of any miner due to pneumoconiosis . . .").

6. Federal Coal Mine Health & Safety Act of 1969, Pub.L. No. 91–173, § 402(d), 83 Stat. 742, *as amended by* Black Lung Benefits Act of 1972, Pub.L. No. 92–303, § 3(b), 86 Stat. 150 (current version at 30 U.S.C.A. § 902(d) (West Supp. 1979)).

7. Federal Coal Mine Health & Safety Act of 1969, Pub.L. No. 91–173, § 402(f), 83 Stat. 742, *as amended by* Black Lung Benefits Act of 1972, Pub.L. No. 92–303, § 4(a), 86 Stat. 150 (current version at 30 U.S.C.A. § 902(f) (West Supp. 1979)). *See generally* 30 U.S.C. § 921(b) (1976); 20 C.F.R. §§ 410.412, .422–.426, .490 (1979).

8. Federal Coal Mine Health & Safety Act of 1969, Pub.L. No. 91–173, § 402(b), 83 Stat. 742, *as amended by* Black Lung Benefits Act of 1972, Pub.L. No. 92–303, § 3(b), 86 Stat. 150 (current version at 30 U.S.C.A. § 902(b) (West Supp. 1979)) (emphasis added). *See generally* 20 C.F.R. § 410.110(*o*), .401(b), .428 (1979).

9. The occupational requirement is included in the definition of "pneumoconiosis" and is not

separately stated. Federal Coal Mine Health & Safety Act of 1969, Pub.L. No. 91–173, § 402(b), 83 Stat. 742, *as amended by* Black Lung Benefits Act of 1972, Pub.L. No. 92–303, § 3(b), 86 Stat. 150 (current version at 30 U.S.C.A. § 902(b) (West Supp. 1979)) (emphasis added). *See generally* 20 C.F.R. § 410.416(b) (1979).

10. 30 U.S.C. § 921(c)(3) (1976). *See generally* 20 C.F.R. § 410.418 (1979).

11. 30 U.S.C. § 921(c)(4) (1976). *See generally* 20 C.F.R. § 410.414(b) (1979).

12. By regulation, the Secretary has indicated that the fifteen-year presumption may be based on "a work history reflecting many years of such coal mine employment (although less than 15)." 20 C.F.R. § 410.414(b)(4) (1979). *Cf.* S. Rep. No. 92–743, 92d Cong., 2d Sess. 13, *reprinted in* [1972] U.S. Code Cong. & Ad. News, pp. 2305, 2317, *reprinted in* 2 Subcommittee on Labor of the Senate Comm. on Labor & Public Welfare, 94th Cong., 1st Sess., Legislative History of the Federal Coal Mine Health & Safety Act of 1969 (Public Law 91–173) As Amended Through 1974 Including Black Lung Amendments of 1972, at 1946, 1958 (1975) [hereinafter cited as Legislative History]:

The Committee intends that the burden will be placed on the claimant to prove the existence of pneumoconiosis in cases where the miner worked fewer than fifteen years in a coal mine, but that judgment will be allowed to be exercised in determining the validity of claims in such cases, including the determi-

quirements, 2, 3, and 4 may be deemed satisfied.

Finally, "if a miner who is suffering or suffered from pneumoconiosis was employed for ten years or more in one or more coal mines there shall be a rebuttable presumption that his pneumoconiosis arose out of such employment"[13] ("the ten-year presumption"[14]). That is, requirement 4 may be deemed satisfied.[15]

*The Regulation.*

By regulation the Secretary has attempted to modify and restrict the statutory definition of "miner." Where the statute speaks of an "individual who is or was employed in a coal mine," the Secretary has substantially altered the phraseology to an "individual who is working or has worked *as an employee.*" 20 C.F.R. § 410.110(j) (1979) (emphasis added). Having introduced the word "employee," which nowhere appears in the relevant portion of the statute, the Secretary has also prescribed that it refers to a "legal relationship . . .

under the usual common-law rules." *Id.* § 410.110(m).[16]

*The Facts.*

The findings of the administrative law judge ("ALJ") were adopted by the Secretary. The ALJ determined that claimant had 7¼ years of work as a coal-mine employee, at least 7¼ years of work in an unincorporated family coal mine of which he was part owner, and approximately 2 years of work in that mine after its incorporation.[17] Thus, even if the work for the close corporation is treated as that of an employee under usual common law rules,[18] of Moore's conceded sixteen or more years of work in coal mines, less than ten years were as an employee as defined by the Secretary's regulation. The ALJ, applying the definition contained in the regulation, refused Moore the benefit of any of the statutory presumptions.

The ALJ, considering a contention of Moore that, even without the benefit of the

---

nation that the miner's disability is not due to pneumoconiosis or that it is not related to his employment in a coal mine. A miner's work history reflecting many years of mining work, though short of fifteen, and the severity of his impairment, shall also be considered.

Counsel for the Secretary informed us at argument that benefits are awarded as if the presumption required only ten years.

We will, however, refer to the presumption in 30 U.S.C. § 921(c)(4) (1976) as the "fifteen-year presumption" to distinguish it from the presumptions in 30 U.S.C. § 921(c)(1), (2) (1976).

In the present case, Moore is not helped by the administrative liberalization of the presumption. Either he was employed in an underground coal mine or its equivalent for more than fifteen years under his theory, or he was so employed for less than ten years under the Secretary's theory.

13. 30 U.S.C. § 921(c)(1) (1976). *See generally* 20 C.F.R. § 410.416 (1979).

14. An analogous ten-year presumption applies to claims for benefits with respect to the death of a deceased miner.

15. If the definitions in the statute and the regulations were strictly applied to the facts needed to trigger the ten-year presumption, the presumption would be nugatory, since according to the definition of "pneumoconiosis" in § 902(b), a miner could not suffer from it without showing that the disease arose out of coal

mine employment. Congress clearly intended, however, that the word "pneumoconiosis" in § 921(c)(1) would refer to a medical condition only, independent of the etiology of that condition. The presumption has been so administered by the Secretary.

16. While arguments could be raised that the shift in definition was adopted only for other purposes, and not with respect to the fifteen-year presumption, which is the crucial provision for the purposes of the present case, we are satisfied that the Secretary meant the introduction of the concept of an employee under usual common law rules to extend to the fifteen-year presumption.

17. Although he did not find that Moore's period of self-employment was spent in an underground coal mine, the then Secretary did rely on the dusty conditions during that self-employment as an alternative cause of any pneumoconiosis which Moore might be able to establish. That reliance is the equivalent of a finding that, whether or not Moore's family mine was an underground mine, the conditions of his work in that mine "were substantially similar to conditions in an underground mine." 30 U.S.C. § 921(c)(4) (1976). *See generally* 20 C.F.R. § 410.414(b)(3) (1979).

18. *See* McCree, J., dissenting in *Montel v. Weinberger,* 546 F.2d 679, 682 (6th Cir. 1976).

presumptions he had established entitlement, found that, as of the relevant date for benefits, Moore had "a chronic respiratory or pulmonary impairment," but that the preponderance of the medical information failed to meet Moore's burden of proof regarding the existence of pneumoconiosis.[19] The ALJ further found that, even if Moore had shown the existence of pneumoconiosis, he had not shown that that illness arose out of his activities *as an employee.* Because of the dusty conditions under which he worked in the family mine, "any pneumoconiosis which the claimant may establish could reasonably have arisen from his self-employed coal mining work . . . ."

The district court, accepting without question the Secretary's regulatory definition of a miner as an employee under usual common law rules, held that there was substantial evidence that claimant had less than ten years as an employee, and it ruled that the presumptions were unavailable to him. It further held that, because of his substantial exposure to coal dust in the family mine, he was unable to establish by other evidence that his respiratory condition, however severe it might be, arose out of activity as a coal mine employee. Accordingly, the court affirmed without reviewing the severity of Moore's respiratory impairment.

Moore claims that for purposes of the ten- and fifteen-year presumptions, Congress did not authorize a distinction between self-employment in one's own coal mine and wage labor in someone else's coal mine, that "employment in a coal mine" or being "employed in a coal mine" were intended by Congress to refer simply to miners' occupations and customary activities, not to who was the entrepreneur.

## II

The regulation on its face accomplishes a change in the statutory language. As a simple matter of customary usage, one who is "employed" is not automatically or predominantly an employee.[20] Since the regulation immediately generates a doubt as to whether it truly interprets the statute, our first task is to determine what Congress intended when it enacted the statute before us.[21]

**19.** The ALJ found that, absent the presumptions, Moore had met his burden of proof under neither the permanent medical criteria nor the interim criteria in 20 C.F.R. § 410.490 (1979).

**20.** Although one meaning of "employ" is to hire as a common law employee, another meaning is to use or occupy advantageously. *See* Webster's 3d New International Dictionary of the English Language Unabridged 743 (P. Gove ed. 1961) [hereinafter Webster's 3d]. The alternative meaning for "employ" is especially likely, indeed preferred, where, as here, the word is used in the passive voice and is followed by "in." Thus, "employed in" often means "occupied at" or "at work in." *See* 3 Oxford English Dictionary at E. 130 (1933) ("in *pass.* often merely to be occupied, to be at work. Const. *about, in, on*"). Similarly, "employment" means "activity in which one engages and employs his time and energies", Webster's 3d, *supra*, at 743, as well as the state of being an employee.

**21.** *See* Jaffe, *Judicial Review: Question of Law*, 69 Harv.L.Rev. 239, 261, 263–64 (1955) (emphasis in original):

[W]hy do courts sometimes pronounce the law and sometimes not? . . . [W]hy are agencies sometimes permitted to make law and sometimes not? *The answer, I submit, should run primarily in terms of clear statutory purpose.* . . . [W]hen we say "run in terms of" statutory purpose we have in mind a concept of statutory purpose which takes account of the fact that the legislature in realizing its purposes has chosen to work through an administrative agency, and so (presumptively as we have said) to confer on it some policy-making function. This discretion should be permitted to function short of the point where the court is convinced of the *clear* purpose of the statute. The court, we have said, should test each exercise of power in terms of statutory purpose. But in a great many cases the court will grant that any one of two or more proposed answers is consistent with the statute. . . . In such a situation agency choice should stand. It is in as good a position, and because of its specialization presumptively in a better, to make the choice.

We do not believe the situation to be one where Congress left the choice of alternatives to the administrative agency. No element of agency superiority because of special expertise was present. *Jaffe goes on:*

It is not, in my opinion, a fulfillment of the judicial function to characterize a question as

■ Although the isolated language of the presumptions and of the definition of "miner" may be susceptible both to the Secretary's interpretation and to the interpretation which Moore urges, the legislative history and statutory purpose of the provisions make abundantly clear that Congress intended to benefit all persons—those employed by third parties and self-employed persons alike—who had contracted a chronic dust disease of the lung as a result of their work in the nation's coal mines.[22]

*The Statutory Language.*

The ease with which the statutory language supports the meaning which Moore urges is shown by the construction of the current version of the statute. In 1978, Congress amended the definition of "miner"[23] and made unmistakable its intent that self-employed miners be eligible for black lung benefits.[24] The Secretary fully ac-

cepts that, under the current language of the Black Lung Benefits Act, self-employment in a coal mine counts toward the definitions of "miner" and "pneumoconiosis" and toward the presumptions.[25] That is, Moore's suggested reading of the statute is accepted today notwithstanding that a miner's work is referred to as "such employment," 30 U.S.C.A. § 902(d) (West Supp. 1979), that pneumoconiosis still must arise out of "coal mine employment," *id.* § 902(b), and that the rebuttable presumptions are still based on the miner's having been "employed for [at least some period of time] in one or more" coal mines. *Id.* § 921(c)(1), (2), (4).

The expected reply of the Secretary, of course, is that self-employment now falls within those sections only because other evidence shows that the 1978 amendments were intended to make benefits available to qualifying self-employed miners. But im-

"one of specific application of a broad statutory term" and then approve the application *if it is "reasonable."* The question in each case of consistency with statutory purpose is addressed to the *judge.* If to him the meaning is "clear," it matters not that the contrary is "reasonable." . . . A judge may say: "There is more than one sensible construction of this statute, but this construction appears to me to be the correct one." If this is what he thinks, he should not defer . . . to the agency.

**22.** Congress saw the benefits not as charity but as the nation's repayment of a debt to the families whose sacrifices in the production of coal were making possible the economic success and the high standard of living enjoyed by the nation as a whole. *See, e.g.,* 115 Cong.Rec. 39714 (1969) (remarks of Rep. Saylor), *reprinted in* 1 Legislative History, *supra* note 12, at 1568:

[This bill] is a little effort to square accounts for what the country did not do before. Heretofore, Mr. Speaker, we followed the practice of getting the most out of our miners and our coal—get it out—get paid and to _____ with all thought of tomorrow.

Mr. Speaker, it is our privilege to sit here in the Halls of the Congress tonight. The lights are bright, not only here in the Halls of Congress, on Capitol Hill, but throughout Washington and throughout our land, not cognizant of the fact that about 80 percent of those lights are generated by coal. Whether you folks realize it or not, this country is today short 15,000 coal miners.

. . . . . .

If we expect to have the kind of economy that we have developed, and if we expect to have electricity throughout the length and breadth of our land; if we expect to have the good things of this country and our world, then we had better pass this conference report.

**23.** *See* Black Lung Benefits Reform Act of 1977, Pub.L. No. 95–239, § 2(b), 92 Stat. 95 (1978):

The term "miner" means any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal. Such term also includes an individual who works or has worked in coal mine construction or transportation in or around a coal mine, to the extent such individual was exposed to coal dust as a result of such employment.

**24.** *See* H.R.Conf.Rep. 95–864, 95th Cong., 2d Sess. 15 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News, pp. 308–309; S.Rep. 95–209, 95th Cong., 1st Sess. 20 (1977).

**25.** *Cf., e.g., Rodman v. Director, Office of Workers' Compensation Programs, United States Department of Labor,* 8 Benefits Rev.Bd. Serv. 1019 (1978) (remanding a case to the ALJ with orders that claimant's experience as the "working operator" of a family-owned coal mine be counted toward the fifteen-year presumption).

plicit in that approach is the assumption that, before 1978, other evidence equally clearly established the opposite, namely that self-employment was not to count for purposes of qualifying for black lung benefits. Yet there is overwhelming evidence that in 1969 and 1972 Congress intended to benefit all persons who were totally disabled by pneumoconiosis as a result of coal mine work. Those constructions of "employed in" and "employment" which are correct to effect Congress' 1978 wishes are also correct in light of, and are required by, earlier congressional intent as well.

■ The Secretary's only evidence that "employed in" and "employment" as used in the statute referred to an employer-employee relation is very indirect and the argument is forced. For the other titles of the Federal Coal Mine Health and Safety Act of 1969 [26] the definition of "miner" was "any individual *working* in a coal mine." [27] An individual engaged in coal mine activity works there as much if self-employed as he does if employed by another. The rebuttable presumption of formal consistency states that use of different language creates the inference that Congress meant different things.[28] So the Secretary's contention is that "employed in" must mean something other than "working in."

However, where the statutory purpose and legislative history establish that no difference was in fact intended, the presumption is rebutted. Inadvertent statutory usage of synonyms in parallel sections does not require us to conjure up a distinction

which would violate the statute's raison d'être.[29]

*Statutory Purpose and the Legislative History.*

The act's remedial purpose was to recognize the widespread incidence of pneumoconiosis among American coal miners and to provide, on a national basis, alleviating compensation. A federal program was needed because in most instances workers' compensation programs of the several states did not provide benefits. That consideration would, of course, be stronger, not weaker, in the case of the self-employed than in the case of those in a traditional common law employer-employee relationship.[30] Nowhere in the legislative history is there any suggestion that a distinction should be drawn between miners in a formal employer-employee relationship to coal mine operators and the individual miner/operators of small mines whose working conditions were comparable to those of miners hired by larger mines. The legislative history contains no suggestion that the American enthusiasm for the sturdy, independent sole proprietor was waning to the point where he would be treated in a disadvantageous manner as compared with miners hired to work by larger operators. The difference between the definition of "miner" in the Black Lung Benefits Title and that applicable to the rest of the 1969 Act arose from the legislative decision to limit black lung benefits to those who actually had been engaged in *underground* coal mining activities and from the need for a defi-

---

**26.** The other titles are concerned primarily with *health and safety standards for active coal miners.*

**27.** Federal Coal Mine Health & Safety Act of 1969, Pub.L.No. 91–173, § 3(g), 83 Stat. 742 (current version at 30 U.S.C. § 802(g) (Supp. I 1977)) (emphasis added).

**28.** *See* R. Dickerson, The Interpretation and Application of Statutes 224 (1975).

**29.** *See id.* at 215 ("[I]f the context of a statute shows a legislative purpose that is broader than the literal import of the words used, the meaning of the statute is correspondingly broadened, but only so far as the words have

enough semantic leeway to carry the broadened meaning.").

**30.** *See* 115 Cong.Rec. 39998 (1969) (remarks of Sen. Javits), *reprinted in* 1 Legislative History, *supra* note 12, at 1631:

[The Black Lung Benefits Title is] a step to insure that the victims of this tragic occupational disease receive some bare minimum of compensation, with the cost to be borne by the Federal Government, insofar as workers for whom no employer liability can be established under traditional workmen's compensation criteria, and by the employers insofar as their responsibility can be established under such traditional criteria.

nition which would cover retired as well as active miners.[31] Thus the special definition was inserted for purposes altogether independent of, and unrelated to, a distinction between "self-employed" and "employed by another."

The members of Congress as the legislation made its way from introduction to enactment appeared to use interchangeably the phrases "was employed in a mine" and "worked in a mine." For example, a frequently used [32] summary of the conference committee's version of the 1969 bill described one of the presumptions as follows: "If a miner worked ten years in [an underground coal] mine and died of a respirable disease, there will be a rebuttable presumption that his death was due to pneumoconiosis." The statute, however, happened to use "was employed . . . in" for this presumption.[33] The "worked in" language for the presumption was also employed during debates by Representative Carl D. Perkins, one of the House conferees and the chairman of the House Committee on Education and Labor,[34] and by Representative John H. Dent, another of the conferees and the chairman of that committee's General Subcommittee on Labor.[35]

Even more to the point is the way the two phrases were indiscriminately used by those who created the fifteen-year presumption in 1972. The presumption was added to the House Bill, H.R. 9212, by the Senate Committee on Labor and Public Welfare and was then accepted by the full Senate and finally by the House. Although the presumption itself used "employed in" and "employment," the Senate committee report tended to use "worked in" and "work":

> The bill . . . establishes a rebuttable presumption that a totally disabled coal miner who *worked* in an underground mine for 15 years or a surface miner who *was employed* under environmental conditions similar to those experienced by underground miners, is totally disabled by pneumoconiosis if he has a totally disabling respiratory or pulmonary impairment, even if he has an X-ray which cannot be interpreted as positive for complicated pneumoconiosis. The Secretary of Health, Education and Welfare may rebut the presumption if . . . he establishes . . . that the miner's disability did not arise out of, or in connection with, his *work* in a coal mine.
>
> . . . .
>
> The Committee intends that the burden will be placed on the claimant to prove the existence of pneumoconiosis in cases where the miner *worked* fewer than fifteen years in a coal mine, but that judgment will be allowed to be exercised in determining the validity of claims in such cases, including the determination that the miner's disability is not due to pneumoconiosis or that it is not related to his *employment* in a coal mine. A miner's *work* history reflecting many years of mining *work*, though short of fifteen, and

---

31. Neither the Senate bill nor the House bill which was substituted for it contained a special-purpose definition of "miner." *See* S. 2917, 91st Cong., 1st Sess., §§ 501–502, 115 Cong.Rec. 28243 (1969), *reprinted in* 1 Legislative History, *supra* note 12, at p. 782; H.R. 13950, 91st Cong., 1st Sess. § 110(b), 115 Cong. Rec. 32061 (1969), *reprinted in* 1 Legislative History, *supra* note 12, at 1402. H.R. 13950 did, however, have a special definition of "coal mine" in § 110(b)(7)(A), which restricted the term to underground mines. Despite the latitude possessed by a conference committee when one house substitutes an entire bill for that passed by the other house, *see* 8 Cannon's Precedents of the House of Representatives of the United States §§ 3265–3268, at 750–54 (1936), the conference bill, which was enacted, was unlikely to

have introduced a restriction on benefits that was not present in either of the constituent bills.

32. *See* 115 Cong.Rec. 39709, 39718, 39983–84 (1969) *reprinted in* 1 Legislative History, *supra* note 12, at pp. 1555, 1579, 1596.

33. *See* Federal Coal Mine Health & Safety Act of 1969, Pub.L.No. 91–173, § 411(c)(2), 83 Stat. 742 (current version at 30 U.S.C. § 921(c)(2) (1976) ).

34. *See* 115 Cong.Rec. 39707 (1969), *reprinted in* 1 Legislative History, *supra* note 12, at p. 1549.

35. *See* 115 Cong.Rec. 39712 (1969), *reprinted in* 1 Legislative History, *supra* note 12, at p. 1564.

the severity of his impairment, shall also be considered. . . .

It must be made clear by the Committee, however, that it expects and intends that miners with fewer than fifteen years *in the mines* who are totally disabled and who have X-ray evidence of pneumoconiosis other than complicated pneumoconiosis, who are now eligible for benefits, will remain so under the Committee amendments.[36]

Such random alternation is not the mark of legislators who intend to deny disability benefits on the basis of the distinction between "worked in" and "was employed in."

The legislators who created the statute believed that it covered all individuals suffering from lung problems contracted in the coal mines.[37] Opponents of the benefits program attacked it as discriminatory because it provided neither for miners disabled by other maladies nor for workers disabled by occupational lung diseases in other industries, but none of the opponents suggested that the program differentiated among victims of black lung disease itself on the basis of "self-employment" versus "employment by another." [38] In considering the target population for the benefit program, members of Congress frequently estimated that there were 100,000 victims of pneumoconiosis, of whom 50,000 were disabled.[39] One hundred thousand was the figure given by the Surgeon General as the

**36.** S.Rep.No. 92–743, *supra* note 12, at 12–13 (emphasis added), *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 2305, 2316–17, *reprinted in* 2 Legislative History, *supra* note 12, at p. 1946, 1957–58.

**37.** *See, e.g.,* 115 Cong.Rec. 27623–24 (1969) (remarks of Sen. Williams) ("[T]here is another 'forgotten man' in this industry who also cries for help. He is the inactive miner who was unfortunate enough to have breathed the coal dust wh[en] he toiled in the mines and who now is totally disabled from a disease that he can hardly pronounce—pneumoconiosis—but [t]hat he can feel."); *id.* at 31607 (remarks of Rep. Flood) ("[This bill] recognize[s] financial responsibility on the part of the Federal Government to those individuals disabled as a result of pneumoconiosis and anthracosilicosis which was contracted in the coal mining industry and who are not entitled to compensation under existing workmen's compensation laws."); *id.* at 31610 (remarks of Rep. Saylor) ("Whether we can call it the original name of miners' cough or pneumoconiosis, it is the same dreadful disease that strikes some of the men who work in the mines. . . . What this bill does is to give these people who have had this mining experience and [are] suffering from the disease, a one-shot operation to be taken care of."); *id.* at 32013–14 (further remarks of Rep. Saylor) ("[T]his is not a workman's compensation bill. This is a responsibility of mankind—we the Congress represent the mankind of the country—it is our responsibility to take care of this in one operation. We have provided the method whereby men suffering from this dread disease and their survivors can get some benefit."); *id.* at 32015 (remarks of Rep. Dent) ("It is a particular type of disease. Everybody that has it will be treated. If you have some corn huskers out your way and they have developed it, we will see that they get whatever it is that you call it, whether it is compensation or something else."); *id.* at 32019 (remarks of Rep. Kee) ("In simple words—this provision merely states that payments will be made to those disabled miners who are no longer physically able to continue working in the coal mines because of this dread and fatal disease. These are the men who are totally disabled but have been denied compensation by virtue of the fact that they are not covered under State workmen's compensation laws and—as such—they are denied these justly due benefits."); *id.* at 39998 (remarks of Sen. Javits) ("[W]e can ensure that those unfortunate miners who have been totally disabled by black lung receive some minimal amount of benefits which would enable them and their widows and children to live with some small amount of economic security. That, in essense, is what has been done in this [conference] report."). Above material *reprinted in* 1 Legislative History, *supra* note 12, at pp. 512, 1214, 1223, 1275, 1279, 1289, 1630.

**38.** *See* H.R.Rep.No. 91–563, 91st Cong., 1st Sess. 63, 72 (1969) (Minority Views of Mr. Ashbrook, Mr. Scherle, Mr. Collins, and Mr. Landgrebe; Supplemental Views of Mr. Ayres, Mr. Quie, Mr. Erlenborn, Mr. Eshleman, Mr. Landgrebe, and Mr. Ruth), *reprinted in* [1969] U.S.Code Cong. & Ad.News, pp. 2503, 2566–67, 2575–76, *reprinted in* 1 Legislative History, *supra* note 12, at pp. 1031, 1093, 1102; 115 Cong. Rec. 31610–11 (1969) (remarks of Rep. Collins), *reprinted in* 1 Legislative History, *supra* note 12, at pp. 1224–25.

**39.** *See, e. g.,* 115 Cong.Rec. 27627 (1969) (remarks of Sen. Javits); *id.* at 32014 (remarks of Rep. Morgan); *id.* at 32052 (remarks of Rep. Mink). Above material *reprinted in* 1 Legislative History, *supra* note 12, at pp. 522, 1277, 1378.

total incidence of black lung in the United States.[40]

The Secretary's predecessor contributed to Congress' belief that all afflicted individuals were covered by the legislation in question. In 1972, nearly two years after the regulations we are considering had been promulgated, the Secretary's predecessor wrote to the chairman of the Senate Committee on Labor and Public Welfare, " 'Employment in underground coal mines' has been interpreted as work in an underground coal mine, whether below the surface performing functions in extracting the coal or above the surface at the mine preparing the coal so extracted." [41] The Secretary stated that he favored continuation of the provisions restricting the program to underground miners. He characterized removing that restriction—removal which, despite the Secretary's opposition, was effected in 1972,[42] retroactive to 1969—as "extension of Federal black lung benefits to all coal miners." [43]

In oral argument, counsel for the Secretary tried to explain why Congress might have restricted benefits to miners employed by others. He suggested that perhaps Congress erroneously believed that all black lung sufferers had been employees. If Congress had had that mistaken belief and if *in haec verba* it had restricted benefits to "employees," then perhaps only Congress could rectify the error. The error is highly unlikely, however, for Senators and Representatives from coal-mining states would surely have known their constituents well enough to appreciate that not all who mined coal did so wearing another's collar. Congress had the manifest purpose of covering all victims, and where it used language which, without strained construction, extends to all victims, we find no justification for an alternate, improbable construction which would rely on a hypothesized congressional mistake and would substantially frustrate the statutory purpose.

Thus, a foundation was altogether lacking for the modification by the Secretary of the statutory language through insertion of the concept represented by the words "by another" after the word "employed." Perhaps the then Secretary was influenced by the considerations that he was using the Social Security Administration to administer the black lung program and that, under the Black Lung Benefits Act, the standards for disability were to be no more restrictive [44] than standards applicable under section 223(d) of the Social Security Act, 42 U.S.C. § 423(d). Social security law, by reason of its peculiar historical antecedents, does concern itself with the distinction between those in the common law employer-employee relationship and self-employed individuals, who pay different taxes to be eligible for social security benefits.[45] However natural the employed-by-another construction may have seemed to persons steeped in the intricacies of the Social Security Act, the purposes of the black lung

---

**40.** 2 *Coal Mine Health & Safety*: *Hearings on S. 355, S. 467, S. 1094, S. 1178, S. 1300, S. 1907, S. 2118, and S. 2284 Before the Subcomm. on Labor of the Senate Comm. on Labor & Public Welfare*, 91st Cong., 1st Sess. 729–30 (1969) (statement of Dr. William H. Stewart, Surgeon General, Public Health Service) ("I have used the figure 100,000 as an estimate of pneumoconiosis that was based on the prevalence rates we found in our study of both active miners and inactive miners. . . . In addition we know from other data . . . that you can come up with a figure close to 100,000 for the total of coal miners pneumoconiosis cases.").

**41.** Letter from Elliot L. Richardson, Secretary of Health, Education & Welfare, to Senator Harrison A. Williams, Jr., at 9 (Feb. 15, 1972), *reprinted in Black Lung Legislation, 1971–72*: *Hearings on S. 2675, S. 2289 & H.R. 9212 Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare*, 92d Cong., 1st & 2d Sess. 22, 30 (1971–1972).

**42.** *See* Black Lung Benefits Act of 1972, Pub. L.No. 92–303, § 3, 86 Stat. 150.

**43.** Letter, *supra* note 41, at 9.

**44.** *See* Federal Coal Mine Health & Safety Act of 1969, Pub.L.No. 91–173, § 402(f), 83 Stat. 742 (current version at 30 U.S.C.A. § 902(f) (West Supp.1979)).

**45.** *Compare* I.R.C. §§ 1401–1403 (tax on self-employment income) *with* I.R.C. §§ 3101–3102 (tax on employees under Federal Insurance Contributions Act).

benefits remedial legislation were quite different. Bureaucratic preference for distinctions long employed for other purposes by the bureaucracy may explain, but it does not justify, the modification of the statutory definition of a miner in a manner never intended by Congress. Indeed, that may be a kinder explanation than history would allow.[46]

### III

Despite the clear indications of congressional intent in 1969 and 1972 to cover all victims of black lung, the Secretary, to justify the unduly restrictive definition of miner for purposes of eligibility for black lung benefits, points to events since 1969 which, she says, contradict the intent and which, therefore, should bar us from giving effect to the intent. The events may be grouped as administrative, judicial, and legislative interpretations of the act.

*Administrative Interpretation.*

■ The administrative interpretation is, of course, the Secretary's own when in 1970 the then Secretary promulgated the regulations whose validity is at issue in this case. However, recourse to administrative interpretation as an aid in ascertaining legisla-

tive intent occurs only when there is ambiguity in the statute.[47] There was no ambiguity. Having determined that the preferred meaning of the language used in the statute and the clear intent of Congress in 1969 coincide, we consider the administrative interpretation as clearly wrong and, therefore, not persuasive.

The statute gave the Secretary explicit authority "to issue such regulations as [he] deems appropriate to carry out the provisions of [the Black Lung Benefits Act]," 30 U.S.C. § 936(a) (1976). If, *arguendo*, Congress thereby entrusted the Secretary with primary responsibility for interpreting all statutory terms, the regulation in question would be "entitled to more than mere deference or weight. It [could] be set aside only if the Secretary exceeded his statutory authority or if the regulation is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' 5 U.S.C. §§ 706(2)(A), (C)." *Batterton v. Francis*, 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977).

■ Even such delegation, however, does not free courts from their responsibilities to say what the law is and to determine

---

**46.** *Cf. Black Lung Benefits: Hearing on H.R. 18, H.R. 42, H.R. 43, & H.R. 5702 Before the Gen'l Subcomm. on Labor of the House Comm. on Education & Labor*, 92d Cong., 1st Sess. 29–30 (1971) (statement of Rep. Ken Hechler):

> When [President Nixon] signed the Federal Coal Mine Health and Safety Act of 1969, it will be remembered that he signed the measure with a great deal of reluctance. . . .
>
> •     •     •     •     •
>
> I can only conclude that some type of an order came down to the Social Security Administration to administer this new law in a restrictive fashion, and in particular to avoid the liberal interpretation of the law to favor the applicants for black lung benefits.

**47.** *Compare NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) *with Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), two cases construing the same word in the same act. In *Hearst*, the Court gave substantial deference to the agency interpretation, but in *Packard* both the majority and the dissenters gave almost none. Both opinions in

*Packard* treated the legislative intent as unambiguous although they disagreed completely about what that intent was:

> The context of the Act, we think, leaves no room for a construction of this section [different from the one we are giving it]. . . .
>
> •     •     •     •     •
>
> There is . . . no ambiguity to be clarified by resort to legislative history . . . . [Nor are we] obliged to depend upon administrative interpretation for light in finding the meaning of the statute . . . .

330 U.S. at 488, 492, 67 S.Ct. at 793.

> If we were to decide this case on the basis of policy, much could be said to support the majority view. But I am convinced that Congress never faced those policy issues when it enacted this legislation. I am sure that those problems were not in the consciousness of Congress. . . . The question is so important that I cannot believe Congress legislated unwittingly on it. Since what Congress wrote is consistent with a restriction of the Act . . . ., I would leave its extension . . . . to Congress.

330 U.S. at 500, 67 S.Ct. at 797 (Douglas, J., dissenting).

whether the regulation in question is consistent with the law. "What Congress has given the Secretary may not take away." *Bozwich v. Mathews*, 558 F.2d 475, 480 (8th Cir. 1977).

Thus, despite express delegation to prescribe standards for determining what constitutes one of the requirements for benefit eligibility, "the Secretary's authority to prescribe standards is not unlimited. [Sh]e could not, for example, adopt a regulation that bears no relationship to any recognized concept of [the requirement in question] or that would defeat the purpose of the [benefit] program." *Batterton v. Francis*, 432 U.S. at 428, 97 S.Ct. at 2407. *Accord, United States v. Larionoff*, 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977):

> [R]egulations, in order to be valid, must be consistent with the statute under which they are promulgated.[12]

> [12] "The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is . . . [only] the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity." *Manhattan General Equip. Co. v. Commissioner*, 297 U.S. 129, 134, [56 S.Ct. 397, 400, 80 L.Ed. 528] (1936).

*Judicial Interpretation.*

The Secretary next turns to court cases which applied her regulation and its definition of employment as excluding self-employment. *Ball v. Mathews*, 563 F.2d 1148 (4th Cir. 1977), contained dicta in which the court without discussion accepted the Secretary's interpretation. *Ball's* holding, however, was that, notwithstanding that interpretation, the claimant met the ten-year presumption test. Such reference to the Secretary's definition, when doing so did not affect the outcome of the case, does not bar us now from questioning the regulation's validity, when the answer to the question makes a difference. Conversely, in *Neese v. Califano*, 594 F.2d 985 (4th Cir. 1979), the regulation's invalidity might have mattered, but neither the parties nor the court addressed the issue. *See* 9 J. Moore,

B. Ward, & J. Lucas, Moore's Federal Practice ¶ 228.02[2.—1], at 28–7 (2d ed. 1980) ("[N]ormally the court will not consider issues that are not . . . raised and argued [in the appellant's initial brief]."); *Virginians for Dulles v. Volpe*, 541 F.2d 442, 444 (4th Cir. 1976).

In *Montel v. Weinberger*, 546 F.2d 679 (6th Cir. 1976), the majority rejected the contention that working for a closely held family corporation constituted "employment" as the Secretary had defined it. The majority opinion contains the flat assertion: "We believe the Secretary's definition is consistent with the language of the act." 546 F.2d at 681. So it may be, if an alternate meaning for the operative word "employment" is adopted, but it is utterly inconsistent with the act's history and purpose. As Judge McCree's dissent indicates, the problem on which the court focused was the propriety *vel non* of treating employment by a close corporation as indistinguishable from self-employment. Not concentrating on the question of the validity of the Secretary's regulation, the *Montel* court reached a conclusion on that point with which we must respectfully disagree.

Other cases in which the Secretary's definition has been uncritically accepted without investigation of the plain meaning of the statutory language and of the legislative history are *Fleming v. Weinberger*, 412 F.Supp. 293 (W.D.Va.1975); *Weaver v. Weinberger*, 392 F.Supp. 721 (S.D.W.Va. 1975); *Markosky v. Mathews*, 435 F.Supp. 374 (E.D.Pa.1977); *Yenetskie v. Secretary of HEW*, 426 F.Supp. 1372 (E.D.Pa.1977); and *Braden v. Mathews*, 407 F.Supp. 1032, 1034 (E.D.Tenn.1976), *aff'd mem.*, 559 F.2d 1219 (6th Cir. 1977). In our view, they are not persuasive authority for the reasons we have outlined in declining to follow *Montel*.

*Legislative Interpretation.*

Finally, the Secretary relies on congressional action in 1972 and 1978 as confirming the accuracy of her perception of the 1969 legislative intent. In 1972, distressed by the rate at which the Secretary was deny-

ing benefits under the 1969 act,[48] Congress liberalized many provisions of the act and made the liberalized provisions retroactive to December 30, 1969.[49] Among the 1972 changes were the introduction of the fifteen-year presumption[50] and an amendment to the definition of "miner" in 30 U.S.C. § 902(d) which substituted "a coal mine" for "an underground coal mine."[51] Since in 1970 her predecessor had promulgated the regulation with the requirement that "miners" be "employees,"[52] the Secretary may point to the 1972 action by Congress as a statutory reenactment which adopted the extant administrative interpretation.

Although reenactment may be "persuasive evidence that the [administrative] interpretation is the one intended by Congress," *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed. 2d 134 (1974), that evidence is subject to rebuttal. As Professor Davis put it, "[T]he committees or subcommittees of Congress may or may not know of outstanding interpretations when they are considering reenactment; they do not in fact approve what they know nothing about."[53]

Moreover, the Supreme Court has stated, "Where the law is plain the subsequent reenactment of a statute does not constitute adoption of its administrative construction." *Biddle v. Commissioner*, 302 U.S. 573, 582, 58 S.Ct. 379, 383, 82 L.Ed. 431 (1938). For instance in *SEC v. Sloan*, 436

U.S. 103, 119–21, 98 S.Ct. 1702, 1712–13, 56 L.Ed.2d 148 (1978), the act before the Court had been re-enacted several times, the administrative interpretation in question had been mentioned at congressional hearings, and at least one congressional committee had filed a report explicitly approving the practice at issue. Notwithstanding the evidence of congressional awareness, the Court held that, even under those circumstances, reenactment did not constitute adoption of the interpretation. "The absence of any truly persuasive legislative history to support the [administrative interpretation], and the entire statutory scheme suggesting that in fact the [interpretation is wrong], reinforce our conclusion . . . ." 436 U.S. at 122–23, 98 S.Ct. at 1714.

In the instant case, when the Secretary's predecessor sent his letter dated February 15, 1972, to the chairman of the Senate Committee on Labor and Public Welfare, the letter may have misled Congress about the substance of the extant administrative interpretation. The letter discussed both the pre-1972 law and the proposed amendment as if there were no employee-status requirement. *See* notes 41, 43, *supra.* Although Senator Randolph during a committee hearing once mentioned the Secretary's requirement,[54] no other legislator or witness even alluded to that requirement, either during committee hearings[55] or on the floor of either house of Congress.[56] It is at least

48. *See* S.Rep.No. 92–743, *supra* note 12, at 3 ("Not only have the number of claims far exceeded those earlier expectations of Congress, . . . but also the rate of denials . . . suggests strongly that the solution has not been nearly as complete as Congress believed and expected it would be."), *reprinted in* [1972] U.S.Code Cong. & Ad.News 2305, 2307, *reprinted in* 2 Legislative History, *supra* note 12, at 1946, 1948.

49. Black Lung Benefits Act of 1972, Pub.L.No. 92–303 §§ 2(b), 3(c), 4(g), 86 Stat. 150.

50. *Id.* § 4(c).

51. *Id.* § 3(b).

52. 30 Fed.Reg. 5623 (1970).

53. 2 K. Davis, Administrative Law Treatise § 7:14, at 67 (2d ed. 1979).

54. *See Black Lung Legislation, 1971–72: Hearings on S. 2675, S. 2289, & H.R. 9212 Before the Subcomm. on Labor of the Senate Comm. on Labor & Public Welfare*, 92d Cong., 1st & 2d Sess. 452 (1971–1972).

55. *See Black Lung Benefits: Hearing on H.R. 18, H.R. 42, H.R. 43, & H.R. 5702 Before the Gen'l Subcomm. on Labor of the House Comm. on Education & Labor*, 92d Cong., 1st Sess. (1971); *Black Lung Legislation, 1971–72: Hearings on S. 2675, S. 2289, & H.R. 9212 Before the Subcomm. on Labor of the Senate Comm. on Labor & Public Welfare*, 92d Cong., 1st & 2d Sess. (1971–1972).

56. *See* 117 Cong.Rec. 36494–507, 40428–58 (1971); 118 *id.* at 12662–63, 12877–905, 15974–80, 16577–87, 18683–86 (1972). Above material *reprinted in* 2 Legislative History, *supra* note

as likely as not, therefore, that the action of Congress in reenacting the language to which the Secretary's interpretation attached was in part the result of reliance on the Secretary's misleading communication.[57]

Given the unambiguous legislative history of, and statutory purpose behind, the Black Lung Benefits Act, the argument is even stronger here than in *Sloan* for holding that reenactment did not constitute adoption of extant but obscure administrative constructions. When Congress remedies some administrative misinterpretations of an existing statute, it does not act at the risk of barring courts from correcting other misinterpretations on which Congress does not then focus its attention. Legislators who believed that they were expanding the availability of benefits will not be deemed by us to have narrowed them. Judge Learned Hand has said in the context of the same tax statute construed by *Biddle*:

> To suppose that Congress must particularly correct each mistaken construction under penalty of incorporating it into the fabric of the statute appears to us unwar-

ranted; our fiscal legislation is detailed and specific enough already. While we are of course bound to weigh seriously such rulings, they are never conclusive; here, it seems to us that they are not enough to turn the scale.

*F.W. Woolworth Co. v. United States*, 91 F.2d 973, 976 (2d Cir. 1937), *cert. denied*, 302 U.S. 768, 58 S.Ct. 479, 82 L.Ed. 597 (1938).

As her last shot, the Secretary puts forth the contention that, in 1978, when Congress clearly included self-employed miners among the beneficiaries of the act,[58] the Committee reports treated that inclusion as an expansion of the act's coverage, rather than as a correction of a prior administrative misinterpretation.[59]

This, of the Secretary's three interpretation arguments, is the one with the most force. While a later Congress cannot dictate what was meant by an earlier Congress, its understanding as to what was meant should be accorded substantial deference by the courts.[60] But it is the intent of the earlier Congress, which enacted the

---

12, at 1761–97, 1803–84, 1995–2072, 2101–23, 1893–919, 1927–34.

**57.** *Cf., e.g.,* 118 Cong.Rec. 18684 (1972) (remarks of Rep. Dent immediately after the enactment of the Black Lung Benefits Act of 1972) ("Every living, nonworking miner who has not made a claim, and has at least 15 years of mining experience . . . , should make a claim now."), *reprinted in* 2 Legislative History, *supra* note 12, at 1929.

**58.** Black Lung Benefits Reform Act of 1977, Pub.L.No. 95–239, § 2(b), 92 Stat. 95 (1978). Under the new definition, the term " 'miner' means any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal." 30 U.S.C.A. § 902(d) (West Supp. 1979). We note that standing alone, the present language, no less than the prior language, could permit the insertion by the Secretary of the concept "for another" after "works" and "worked." Congress, however, made clear in the legislative history that its objective was to insure coverage of self-employed miners. *See* note 24 *supra*.

**59.** For instance, the conference committee report described the change as one which "modified the definition." H.R.Conf. Rep. 95–864,

*supra* note 24, at 15, *reprinted in* [1978] U.S. Code Cong. & Admin.News, p. 308. The Senate committee report stated, "The term is expanded in the Committee bill to include additional workers. . . . The expanded definition in the Committee bill includes those managers or owners of very small mining operations who themselves work or have worked in the extraction of coal." S.Rep. 95–209, *supra* note 24, at 20. The report also sets out certain items under the heading "Clarifications of Legislative Intent" but does not list in that category the Secretary's introduction of the requirement of employment by another. *Id.* at 22–23.

**60.** *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969); *FHA v. The Darlington, Inc.,* 358 U.S. 84, 90, 79 S.Ct. 141, 145, 3 L.Ed.2d 132 (1958). We note that in both *Red Lion* and *Darlington* the Court's use of later congressional understanding of an earlier statute resulted in greater continuity between the Court's construction of the earlier statute and its construction of the subsequent enactment. Here the Secretary urges us to use a later expression of understanding as grounds for the creation of a substantial discontinuity between the earlier and the later enactments.

statute, that controls.[61] In the instant case, we regard the committees' subsequent interpretation of the 1969 act as inconsistent with the clear 1969 statutory purpose and history. To the extent a later Congress erred, the error was induced by the Secretary's regulatory definition [62] and by some courts' uncritical application of the definition. The main purpose of Congress in 1978 was to insure that benefits would no longer be denied because part or all of a miner's activities had been in "self"-employment. It was interested in curing a situation for the future and not in apportioning blame by ascertaining whether the situation arose as a result of misinterpretation of the earlier statute or as a result of inadequacy of the earlier statute. The clear meaning of the 1969 statute itself suffices to outweigh anything a congressional committee could have said in later years.

For this court, on the other hand, the question of the origin of the exclusion of self-employment is the crucial one. With all deference to the Ninety-Fifth Congress, we adhere to our conclusion that the 1969 statute enacted by the Ninety-First Congress was misinterpreted, first administratively, then judicially, and finally legislatively.

## IV

Accordingly, we reverse and remand with instructions that the district court order the Secretary to make her findings giving the claimant the benefit of presumptions deriving from over fifteen years of coal mine employment.

*REVERSED AND REMANDED.*

K. K. HALL, Circuit Judge, dissenting:

As much as I would like to concur in the majority opinion, I cannot. The majority concludes, despite the Secretary's regulation to the contrary, 20 C.F.R. § 410.110(j), that the Federal Coal Mine Health and Safety Act of 1969, and its 1972 amendment, provides benefits to self-employed miners. The bare language of the 1969 Act is subject to the majority's interpretation, but I think that interpretation is foreclosed by the legislature's explicit response to the dilemma of the self-employed miner and by our own precedents, which have already developed a body of case law implementing the regulation which the majority now strikes down as unreasonable.

There is no discussion in the legislative history of the 1969 Act or its 1972 amendments regarding coverage of the self-employed miner. In 1977, however, Congress recognized the special need to provide for the self-employed miner by amending the definition of "miner" to include "any individual who works or has worked in or around a coal mine or a coal preparation facility in the extraction or preparation of coal." 30 U.S.C. § 902(d). The explanation of this amendment by the Senate Committee on Human Resources is most illuminating:

*Definition of miner*—The term is expanded in the committee bill to include additional workers. Existing law limits the term miner to "any individual who is or was employed in a coal mine." The expanded definition in the committee bill includes those managers or owners of very small mining operations who themselves work or have worked in the extraction of coal. The number of such individ-

**61.** *See Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758, 99 S.Ct. 2066, 2072, 60 L.Ed.2d 609 (1979); *United Airlines, Inc. v. McMann*, 434 U.S. 192, 200 n. 7, 98 S.Ct. 444, 449, 54 L.Ed. 2d 402 (1977) ("Legislative observations 10 years after passage of the Act are in no sense part of the legislative history."); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 354 n. 39, 97 S.Ct. 1843, 1864, 52 L. Ed.2d 396 (1977) ("It is the intent of the Congress that enacted [the section in question], unmistakeable in this case, that controls.").

**62.** The same explanation applies to Senator Randolph's uncritical assumption in 1972, two years after original enactment, that "self-employed miners are not now covered under title IV." *Black Lung Legislation, 1971–72: Hearings on S. 2675, S. 2289, & H.R. 9212 Before the Subcomm. on Labor of the Senate Comm. on Labor & Public Welfare*, 92d Cong., 1st & 2d Sess. 452 (1971–1972).

uals is very small—not more than 500—and the number of these who are totally disabled because of their work in a mine must be far smaller; but the Committee believes that they should be permitted to apply for benefits by virtue of their work as coal miners.

S.Rep.No. 209, 95th Cong., 1st Sess. 20 (1977).

The Senate Committee's clear pronouncement that the new definition *expanded*[1] the coverage of the Act finds support elsewhere in the legislative history of the 1977 Act. In the same report, the Committee itemized certain "Clarifications of Legislative Intent," *id.* at 22–23, but made no mention of the definition of "miner." The conference committee remarked that the Act's definition of "miner" had been modified by the Senate amendment. H.R.Conf. No. 864, 95th Cong., 2d Sess. 15 (1978) *reprinted in* U.S.Code Cong. & Admin.News, pp. 308, 308–09.

It is settled that subsequent legislative pronouncements may be considered to assist in the interpretation of prior legislation on the same subject. *Great Northern Railway v. United States*, 315 U.S. 262, 277, 62 S.Ct. 529, 535, 86 L.Ed. 836 (1942). The majority attempts to circumvent this damaging legislative history by asserting that the deference we normally accord such statements is inappropriate when intent of the earlier Congress is clearly to the contrary. To me, the mandate of the 1969 Congress was anything but clear on the question now before us.[2]

Underlying the majority opinion is the assumption that Congress felt the debt owed the miner to be a public debt for which the citizens of this country are responsible because of their exploitation of the human resource that keeps their lights burning and their houses warm. Maj. op. n. 22. Indeed, this is true, but only in part. Congress also recognized another responsi-

ble party—the employer. The very structure of the Act is directed towards the ultimate assumption of liability by the operator-employer, preferably under an approved state workmen's compensation law. 30 U.S.C. §§ 931–933 [Part C claims]. *See also Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 18–20, 96 S.Ct. 2882, 2893–2894, 49 L.Ed.2d 752 (1976). Created in response to the inadequacies of existing state workmen's compensation laws, the Black Lung Act is nevertheless a workmen's compensation type of law.

The owner in theory, has the ability to earn a profit from his investment, to decide what his role in the production will be, and to control, to the extent possible, the working conditions in the mine. Consistent with this view, Congress might well have assumed that the self-employed miner, who sets his own wage and controls his own working conditions, could be left to his own devices. The Secretary's definition, viewed in this light, is sustainable. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). And, our opinion in *Ball v. Mathews*, 563 F.2d 1148 (4th Cir. 1977) embodies this approach by adopting a practical, rather than formalistic, definition of employment which takes into account degree of control and opportunity for profit. *Id.* at 1151–52. Cf., *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947).

The case law, of course, does not formally address the particular challenge presented here. *See Ball v. Mathews, supra; Neese v. Califano*, 594 F.2d 985 (4th Cir. 1979); *Fleming v. Weinberger*, 412 F.Supp. 293 (W.D.Va.1975); *Weaver v. Weinberger*, 392 F.Supp. 721 (S.D.W.Va.1975); *Markosky v. Mathews*, 435 F.Supp. 374 (E.D.Pa.1977); *Yenetskie v. Secretary of HEW*, 426 F.Supp. 1372 (E.D.Pa.1977); *but see Montel v. Weinberger*, 546 F.2d 679, 681 (6th Cir. 1976). These holdings are therefore not

---

1. It is not insignificant that the committee's reference to the small number of miners affected by the change seems to argue for a change by minimizing the additional cost of coverage.

2. As to the interchangeability of the terms "worked" and "employed" in the legislative history, the Secretary's definition is not in conflict. "Employees" covered by the Act have "worked" in the mines.

absolutely binding on the court, but I do not think we can easily ignore a growing body of precedent, in this circuit and elsewhere, designed to implement and flesh out the Secretary's interpretation of the Act.

It is with considerable reluctance that I dissent in this case. The realities of life in the coal fields certainly justify coverage of the self-employed miner under the Act. *See* S.Rep.No. 279, *supra; Yenetskie, supra* at 1375. Nevertheless, I think the legislative history and our prior acceptance of the Secretary's rule compels its application once again in this case.